In the Matter of the Application

of

TRI-CONTINENTAL CORPORATION,

Petitioner,

*vs.*

STANLEY BATTYE, CENTRAL STATES ELECTRIC CORPORATION IN REORGANIZATION, DREYFUS & CO., ILSE HIRSCHMANN, OTTO HIRSCHMANN, McDONNELL & CO., MERRILL LYNCH, PIERCE, FENNER & BEANE, and GRIFFITH MOORE,

Defendants,

for a determination by an appraiser to be appointed by the Chancellor, of the value of the stock of General Shareholdings Corporation held by Defendants.

*New Castle, June 15, 1949.*

*William Prickett, (William Dwight Whitney, Albert Rosenblum, Cravath, Swaine & Moore,* of New York City, of counsel), for petitioner.

*Charles F. Richards,* of the firm of Richards, Layton & Finger, and *Austrian & Lance,* of New York City (*George Rosier* and *Zelig R. Nathanson,* of New York City, of counsel), for exceptants Carl J. Austrian and Robert G. Butcher, Trustees, Central States Electric Corporation.

*Stewart Lynch* for certain exceptants.

SEITZ, Vice Chancellor: The issue presented involves the propriety of the appraiser's approach in determining the value of dissenters' stock under the appraisal statute.

General Shareholdings Corporation (hereafter called "General"), a Delaware corporation, was merged into Tri-Continental Corporation, a Maryland corporation, as of October 1, 1948. Some of the common stockholders of General objected to the merger and after complying with the provisions of the Delaware appraisal statute became entitled to a valuation of and payment for their shares. *Rev. Code* 1935, § 2093, *as amended.*

A short statement of General's corporate history will be of value here. Because of its accuracy and importance, the following protracted quotation from the appraiser's report dealing with the history of this and other closed-end investment companies will aid in an understanding of the problem here presented:

"General Shareholdings Corporation was incorporated on March 8, 1929 under the name of 'Electric Shareholdings Corporation' to hold a relatively few public utility stocks, the largest holding being common shares of The North American Company. In November 1938 the controlling interest represented by about 78% of the common stock

was sold to Tri-Continental Corporation and its affiliate, Selected Industries, Inc., and shortly thereafter the name was changed to General Shareholdings Corporation.

"With the change of control a program was instituted whereby the holding of North American common stock was materially reduced and a diversified list of investments purchased. Whereas at the end of 1938 General held 392,952 shares The North American Company common stock which represented 51.76% of its gross assets, by September 30, 1948 the North American shares had been reduced to 57,600 shares representing only 4.37% of the gross assets. (Central States Exhibit #2).

"As of September 30, 1948 (the date of the merger was October 1, 1948 but by stipulation—see Plaintiff's Exhibit #1—the value of the common stock of General on September 30, 1948 was the same as the value of such stock at the opening of business on October 1, 1948, when the merger became effective), General Shareholdings Corporation was a closed-end regulated investment company, with leverage, holding diversified investments, most of which were common stocks and somewhat speculative or convertible corporate bonds and preferred stocks. All of the investments were what are generally called 'marketable securities' except a $5,000 holding in Union Service Corporation, a corporation furnishing investment service for Tri-Continental and its affiliates.

"General's portfolio as of September 30, 1948 was comprised of one issue of Federal Home Loan Bank bonds, 19 issues of corporate bonds, 25 issues of preferred stocks and 83 issues of common stocks. The number of companies in which General was invested was somewhat less than the total of the above issues as in certain cases more than one issue of the same company was held.

"The diversification of the portfolio and the cash, net of current liabilities, on the basis of market values as of September 30, 1948, was as follows:

| | | |
|---|---|---|
| "Federal Home Loan Bank Bonds | $ 700,219. | 3.5% |
| Corporate Bonds | $ 1,966,633. | 9.8% |
| Preferred Stocks | $ 1,932,064. | 9.6% |
| Common Stocks | $13,962,008. | 69.7% |
| Total Securities | $18,560,924. | 92.6% |
| Cash (net of current liabilities) | 1,480,327. | 7.4% |
| Total net assets | $20,041,251. | 100.0% |

"The capital structure of General on the basis of the above market values, as of the same date, was as follows:

| "Funded Debt—3% debentures due 1960 at par | $ 2,650,000. | 13.2% |
| Preferred Stock—$6 cumulative at re- demption price of $105 | $ 9,528,750. | 47.6% |
| Common Stock—1,602,475 shares | $ 7,862,501. | 39.2% |
| | $20,041,251. | 100.0% |

"As a regulated investment company, having registered under the Investment Company Act of 1940 [15 *U. S. C. A.* § 80a—1 *et seq.*], General had to distribute all of its income from interest and dividends but, by so doing, escaped any tax on the amounts so distributed. In addition, it had the option of distributing to its stockholders net long term capital gains or paying a flat 25% Federal tax on them, although, like an individual, it had the right to deduct from capital gains, capital losses carried over from prior years.

### "History of Closed-End Investment Companies

"It seems appropriate at this time to mention briefly the back-ground and history of closed-end investment companies. Although a few such companies had been in existence for some years, most were formed in the middle and late 1920's. Reflecting the speculative spirit of the times, the newly formed companies generally were created with material amounts of senior securities so when the depression of the 1930's occurred, the common stockholders found their shares 'under water' as the securities in which the companies had invested declined materially in value while the senior obligations still remained out-standing. Because of this experience and the fact that too many com-panies had been used by their sponsors for their own advantages, the closed-end companies soon were in disrepute and the natural result was the formation of a new type of company, the so-called 'open-end' investment company.

"The unfortunate experience that the investing public had with closed-end companies coupled with the still junior position of many of their common stocks accounts to a material extent for the general lack of investment favor with which most of them are still regarded.

### "Leverage

"As leverage is an important factor in this appraisal it seems well to illustrate how it works. If a closed-end investment company owned assets with a market value of $10,000,000, and had $10,000,000 of bonds or preferred stock outstanding, its common stock would have no assets

applicable to it, or would have a zero asset value. If the value of the assets declined, the common stock of the company would then be considered to be 'under water' as assets would not be equal to the outstanding senior securities, and in such a case, the common stock would be said to have a negative asset value. If, on the other hand, the assets held increased 10% in value and there were 1,000,000 shares of common stock outstanding, the assets would then be worth $11,000,000 or $1,000,000 more than the senior securities and the common stock would have an asset value of $1 per share. A second $1,000,000 increase in the value of the assets would be an increase of about 9.1% and would increase the asset value of the common stock to $2 per share. In other words, in this latter case a 9.1% increase in the market value of the assets would result in a 100% increase in the asset value of the common stock. The next $1,000,000 increase in the value of the assets would be an increase of $8 1/3%$ and would result in a 50% increase in the asset value of the common stock; the next $1,000,000 increase would be almost a 7.7% increase and the asset value of the common stock would rise $33 1/3%$; the next $1,000,000 increase would be 7.1% and result in a 25% increase in the value of the common stock, and so on. Needless to say, in a declining market the reverse is true and the same decreases in the value of the assets result in progressively larger percentage decreases in the asset values of the common stock until the asset value of the common is wiped out.

"This situation is discussed in some detail as it is fundamental in the case of closed-end investment companies with leverage and consequently it is of importance in arriving at a fair value for General Shareholdings Corporation common stock."

The appraiser then discussed in his report the valuation approaches taken by the counsel for the petitioning corporation and for the dissenting stockholders. After analyzing the testimony of the expert witnesses, the appraiser reached the conclusion that the proper approach in determining the "value" of the common stock was first to find the net value of the assets. After so finding, the appraiser concluded that some addition should be made to net asset value based on General's favorable tax position. The appraiser rejected General's contention that the favorable tax position factor was reflected in the "discount" figure applied in this case. I accept the appraiser's conclusion.

The appraiser then discussed various valuation factors and stated his conclusion with respect thereto. Thus, the

appraiser said he was in accord with the concession of the parties that the management record of General was satisfactory, and that no credit or debit to the value of the stock was called for on account of the management factor. I agree.

Neither the appraiser nor the parties believed that the earnings and dividends were to be given much consideration because it was conceded that in the case of investment companies, earnings and dividends are generally low since securities are primarily purchased for the purpose of capital appreciation. Consequently, the important factor in such an enterprise is not earning power, but the immediately realizable value of its cash and marketable securities. I accept and adopt this conclusion.

The matter of expenses of operation was reviewed and the appraiser determined that no plus or minus factor was involved. I accept and adopt this conclusion.

The stock was traded on the New York Curb exchange. The market for this stock was quite inactive, and the appraiser concluded that there was no true market value to be found which was uninfluenced by the merger. This conclusion is adopted.

Finally, the appraiser discounted the net asset figure by 25% and concluded that the resulting figure was the per share value. It is the 100% weight given to this value which is principally under attack by exceptants.

The appraiser also treated and disposed of several items of value which it is unnecessary to mention, except to say that I agree with his conclusions.

After considering the various matters I have mentioned, the appraiser then proceeded to make his appraisal. His approach can best be understood by quoting from his report:

"I am now ready to give my appraisal. In arriving at a fair value

for General Shareholdings Corporation common stock as of September 30, 1948, I have in accordance with the statute eliminated all considerations with respect to the expectation or accomplishment of the marger. I have considered all elements of value whether or not I accorded them weight. My opinion is that the basic consideration is the nature of the enterprise, namely, a closed-end diversified investment company with considerable leverage. As General must be considered as a going concern, I did not appraise a proportionate interest in a group of marketable securities.

"I have given careful consideration to the importance of asset value as all of the assets were marketable securities and could be liquidated without too much difficulty within a reasonably short time, which is seldom the case. However, I found that asset value was not in itself controlling as comparisons with similar companies in the same field clearly showed that most market values most of the time were well below asset values. The values of stocks of similar companies are of material significance as a stockholder is always at liberty to sell his interest in an overvalued company and buy stock in an undervalued one. Experience has shown that for some years closed-end investment companies have been unpopular with the public and although some slight improvement in that aspect may have been taking place it had not gone far enough to change materially the position of these companies. As Wiesenberger says on Page 89, discussing discounts, 'there may be an excellent reason for the apparently improper market appraisal. Some discounts are due to the speculative hazard of the issue.' Certainly in the case of General the common stock is speculative as it is preceded by about $12,000,000 of senior securities which have a first claim on the assets of slightly over $20,000,000. The past record of the company is evidence enough of the junior nature of the common stock and the 6% or greater yield during 1948 on General's preferred stock is certainly an indication of the lack of investment quality of the common stock.

"As an investment company of the subject type invests mainly in marketable common stocks, it is important to review the position of the stock market at the time of valuation. If the stock market is unduly low additional value can well be given to the shares of the investment company, as the reattainment of a more normal level for the market would result in a materially higher value for the investment company shares due to the leverage factor discussed before. If, on the other hand, the market is unduly high some reduction in value should be made as the inevitable decline in the market will, through leverage, result in a considerably larger decline for the shares.

"In my opinion, the level of the market as of September 30, 1948 was neither unduly high, nor unduly low so no such adjustment in

value seems called for. The Dow-Jones Industrial Average closed on September 30, 1948 at 178.30, which compares with its ten year moving average at the end of 1948 of 148.89, and its five year moving average as of the same date of 171.82. I do not have the figures as of three months earlier but they would not be materially different as both moving averages were in an upturn and the comparable figures at the end of 1947, were 143.83 and 162.47, respectively. The Average at 178.30 was about 15% below the 1946 high of 212 and about 94% above the 1942 low of 93 but it was just about at the mid-point of the 163-193 limit of trading for the two year period then ending.

"Accordingly, I am satisfied that as of September 30, 1948, the stock market should be considered to be near, what might be called, a normal level. At least, in my opinion, it is close enough to a normal, that no adjustment is in order. Accordingly, when I calculate the asset value for General I shall make no upward or downward adjustment in it on account of the level of the market."

The appraiser then takes up the question of what additional value should be added to the net asset value based on the favorable tax position of General. After discussing the various contentions and the testimony, the appraiser determined that the favorable tax situation was entitled to a value of 29c per share. I accept and adopt this conclusion.

Finally, the appraiser sets forth his actual calculations and conclusions and determination of value in the following language:

"In arriving at a fair asset value for the shares of General I think that its net asset value as of September 30, 1948 should not be the determining figure even though the record shows that the assets could be sold quite promptly. It is seldom in order to use a one day figure as such a figure could well be too high or too low. A reasonable period seems to be much fairer. Accordingly, I have used the month end figures of July, August and September, 1948 which average $5.15. I do not believe that it is necessary or desirable to use a longer period of time as practically all of the assets of General were readily marketable, the level of the stock market as of the three dates was about the same and was about the same as the average level for the two year period ended September 30, and, if the period is extended, one immediately runs into a temporary higher market which existed a relatively short time.

"Adding the 29c per share for the favorable tax position to the $5.15 per share for the asset value, results in $5.44 per share for General's common stock as of September 30 before applying a proper discount to determine the fair value of the stock as of that date. As mentioned before, there is no question in my mind that a discount of an asset value is pertinent and necessary to determine a fair value.

"The reason for discounts for stocks of closed-end investment companies with leverage is readily apparent. The shareholder has no right of redemption and, of course, no claim to any of the individual assets held. If the stock market declines, the asset values of his shares will go down faster and if the market declines far enough, there will be only a small asset value and then none applicable to them. If the asset value shrinks to a very small figure or to nothing it is equally apparent why the shares should then sell at a figure above asset value as if the market subsequently recovers, the asset value for the shares will rise at a faster rate than the market.

"In the case of General, the asset value of the common stock, although not large, is of sufficient size to call for the application of a discount in determining the fair value of its stock. Even if it were true, as Mr. Chandler stated, that there was no consistent pattern of discount for General—an opinion I do not share—there were stocks of other sufficiently comparable closed-end investment companies to illustrate conclusively that a discount to asset value was necessary to arrive at a fair value.

"In determining a fair discount for General I have considered the group experience of the stocks of the 16 companies in Petitioner's Exhibit #11, the experience of the common stock of Tri-Continental Corp., a stock quite similar in many respects to General, and, to a lesser extent, the experience of the common stock of General. The figures follow:

"Average of the Discounts for 16 closed-end investment company stocks as of the end of eight quarters ending September 30, 1948 — 27%

"Average of the discounts for same as of the end of four quarters ending September 30, 1948 — 24%

"Discount for same on September 30, 1948 — 21%

"Average of the discounts for Tri-Continental Corp. common stock as of the end of eight quarters ending September 30, 1948 — 31%

"Average of the discounts for same as of the end of four quarters ending September 30, 1948 — 27%

"Discount for same on September 30, 1948 — 27%

"Average of the discounts for General common stock as
of the end of seven quarters ending June 30, 1948     31%
"Average of the discounts for same as of the end of
three quarters ending June 30, 1948     27%

"The average of the above discount figures is 27% but some adjustment should be made as the average does not reflect the trend toward somewhat lower discounts. If greater weight is given to the more recent discounts, a figure nearer 25% is obtained. (One method used was to give a weight of three to the discounts of September 30, 1948, a weight of two to the averages of the discounts for the four (or three) quarters ending the same date (or June 30, 1948) and a weight of one to the averages of the discounts for the eight (or seven) quarters also ending the same date (or June 30, 1948)—the net result being a discount figure of 25½%).

"Using judgment and preferring a round figure for a factor that can not be calculated exactly, I arrive at the conclusion that a fair discount to be applied to the value of General's stock is 25% which, when applied to the $5.44 value above, results in a fair value as of September 30 of $4.08 per common share. This is my appraisal for the subject stock."

It will thus be seen that the appraiser took net asset value as calculated by him, added a value for the company's favorable tax position, and then discounted the aggregate by 25%, and concluded that the resulting figure constituted the value of the stock under the appraisal statute. While the contentions of the petitioning corporation were not accepted in all cases by the appraiser, nevertheless, the petitioner filed no exceptions to the report. However, exceptions were filed by certain of the stockholders entitled to an appraisal. While numerous in number, they actually raise but one substantial point—the correctness of applying the 25% discount to the fair asset value, and then determining that the resultant figure was entitled to 100% weight in determining the value of General's common stock for appraisal purposes.

The argument of the exceptant goes like this: the appraiser's technique of discounting asset value resulted in his constructing a hypothetical market value; the appraiser then accorded 100% weight to such market value; the ap-

praiser's finding that 100% weight should be accorded to such market value is contrary to Delaware law; the appraiser should have given controlling weight to the asset value; when this is done the value of the shares will be greater than the value found by the appraiser.

As is so often the case, the parties are in agreement as to the legal principles, but are in disagreement as to the consequences of their application to the facts in this case. It has been repeatedly stated in this court[1] that market value, *qua* market value, is not the sole or exclusive criterion of value in appraisal proceedings, and that due weight under the circumstances must be accorded to other relevant elements of value. Let us see if the appraiser properly applied this rule.

I have quoted at length from the appraiser's report because it gives us a lucid presentation of the unique features of closed-end investment companies with leverage, and the consequent difficulties involved in valuing its common stock for purposes of our appraisal statute. I accept and adopt the appraiser's method of valuing the net assets at $5.15 per share, plus 29c per share for General's favorable tax position, or a net asset value of $5.44 per share on September 30, 1948. I further conclude that in this type of company and for purposes of this appraisal the 29c per share tax advantage figure is properly includable as part of net asset value.

After determining the net asset value per share, the appraiser decided that a "proper discount" should be applied to the $5.44 figure in order to determine the "value" of General's common stock for appraisal purposes. It is this aspect of the appraiser's action which is most vigorously attacked by the exceptants.

---

[1] *Chicago Corp. v. Munds, et al.*, 20 *Del. Ch.* 142 172 *A.* 452; *Root v. York Corp.*, 29 *Del. Ch.* 351, 50 *A.* 2d 52; *In re General Realty & Utilities Corp.*, 29 Del. Ch. 480, 52 A. 2d 6.

It is important to consider the significance of "discount" in the closed-end investment trust field where the element of leverage is involved. Experience has demonstrated that the common stocks of closed-end investment trusts with leverage consistently sell on the market below the net asset value of such shares when the market value thereof reaches approximately $4.00 per share. This disparity in value between net asset value and market value is the "discount" to asset value applied by the appraiser. The reason for this spread between net asset value and market value is explained in part by the leverage factor, and in part by natural sales resistance which arises when stocks reach a certain market value. Obviously, the ratio of market value to net asset value is different for each such company. The ratio is also different for each company at different times. The exceptants contend that the appraiser improperly decided that a 25% discount should be applied.

It appears that the appraiser constructed his 25% discount figure from an examination of the averages of similar companies, and the average of this particular company, and after giving such weight as he deemed appropriate to the various averages concluded 25% was a fair discount for this stock.

I am inclined to believe, as did the appraiser, that no fair actual market price for General's stock which could here be used was obtainable because of the influence of the merger for a substantial period prior to the effective date thereof. The appraiser, therefore, properly used as one element in determining a fair discount rate the average discount for General's stock for periods prior to the time the market was influenced by the merger. Exceptants contend that the discount applied was unsupported by the relevant evidence. Since the situation does not permit an actual determination of the average discount for this company because of the influenced market price, it seemed appropriate for the appraiser to consider average discounts in

similar companies along with reliable evidence of the discount history of General. This he did, and arrived at a figure of 25% by weighing the various averages for General's stock and similar stocks for different periods. Under the circumstances of this case the 25% figure applied by the appraiser does not appear to be unfair. Doubtless, other figures could be sustained based upon a different emphasis, but I am inclined to accept 25% as a fair discount here.

I am, therefore, in accord with the appraiser's procedure in discounting by 25% the net asset value (including tax advantage) of $5.44 per share. But, I differ with the appraiser's conclusion that the resulting figure of $4.08 is to be used as the per share "value" of the shares here appraised. I reach this conclusion because it seems to me that the "discount" characteristic applied by the appraiser has exclusive application to the question of but one element of value, namely, market value. As heretofore stated, and as the appraiser recognized in discussing the term discount, that term is only applied because studies have demonstrated that such stocks almost invariably sell on the market below their net asset value as net asset value is here calculated by the appraiser. The exceptants say that the appraiser by the procedure he employed constructed a hypothetical market value, and then determined that such value was the value for appraisal purposes. Such would appear to be the case.

The fact of finding a hypothetical market value was not error when the appraiser concluded—as he properly did—that there was no reliable uninfluenced actual market value. I adopt the appraiser's conclusion that the per share value on September 30, 1948 was $4.08, but I conclude that the $4.08 per share value was only one element of value, namely, constructed market value. The appraiser, therefore, improperly concluded that the constructed market value was entitled to 100% weight in determining the value of the shares for purposes of our appraisal statute, unless

it can be said that no other element is entitled to consideration under the circumstances. Generally speaking, of course, under the Delaware law market value is but one element, and under the circumstances it seems to me that a constructed market value is but an element, albeit a substantial element, in the case of a closed-end investment trust with leverage.

What weight should be given to the constructed market value figure of $4.08 per share in arriving at the appraised value? All parties concede that earnings and dividends are not here important. They also agree that the management record, etc., do not constitute a plus or minus figure. The principal contention of the exceptants is that the net asset value of the common stock should be weighted at 75% and constructed market value at 25% in determining ultimate appraised value.

It is apparent, of course, that substantial consideration has been given to net asset value in arriving at a constructed market value since the discount is geared to net asset value. It seems to me, however, that net asset value, unaltered by the "discount" factor, should be considered as an independent element of value in this case. This is so because net asset value is the value based on mere possession and mere possession is important where capital appreciation is the principal attraction. Compare *In re General Realty & Utilities Corp., supra.*

I conclude that the constructed market value and net asset value should be fairly weighted to determine the value of the shares here involved. It remains to be determined what weight should be given each of these factors. If experience in this type of stock has demonstrated, as exceptants contend, and the corporation concedes, that such stock is held primarily for capital appreciation then actual market value, or in our case constructed market value is to be given great weight even under our appraisal statute since we are determining the value of stock in an operating in-

vestment trust. This is particularly true where earnings and dividends are not considered too important, contrary to the situation in business concerns generally. But it seems to me that since value is so delicately attuned to net assets and since leverage is so important, the value factor "net asset value" should receive substantial independent weight. This is particularly true where, as here, the assets are practically liquid; though I also appreciate that we may not in this proceeding consider the corporation to be in liquidation. Any weighting of the factors is, of course, arbitrary, but within a range I think entirely reasonable since we must arrive at a dollar and cents figure. Upon due consideration of the record and the appraiser's report, I conclude that it is reasonable to weight constructed market value at 60%, and net asset value at 40%. I lean toward a greater percentage in favor of constructed market value since it, as calculated, gives some weight to the net asset value factor. When so weighted, the value of each share for purposes of this appraisal will be as follows:

| | | |
|---|---|---|
| Net Asset Value | $5.44 X 40% | = $2.176 |
| Constructed Market Value | $4.08 X 60% | = $2.448 |
| | | $4.62 |

In all other respects the conclusions of the appraiser are adopted and his report confirmed, except that I determine the value of the stock entitled to an appraisal to be $4.62 per share.

At the time fixed for the entry of the order hereon counsel will be heard with respct to any undetermined matters, including the appraiser's fee.

An order accordingly will be entered on notice.

Note: Reserved on appeal with directions. See *post p.* 523, 74 *A. 2d.* 71.