**E. F. GIBBONS et al., Petitioners,**

**v.**

**SCHENLEY INDUSTRIES, INC.,
Respondent.**

Court of Chancery of Delaware,
New Castle.

Submitted Jan. 29, 1975.

Decided May 16, 1975.

Bruce M. Stargatt and Jack B. Jacobs of Young, Conaway, Stargatt & Taylor, Wilmington, and James L. Adler, Jr., of Greenbaum, Wolff & Ernst, New York City, for petitioner Dade & Co.

Howard L. Williams and Edward M. McNally of Morris, James, Hitchens & Williams, Wilmington, and Philip S. Ehrlich of Ehrlich, Allison & Rovens, San Francisco, Cal., for petitioner Bank of America.

William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Leon Silverman and Marc P. Cherno of Fried, Frank, Harris, Shriver & Jacobson, New York City, for respondent Schenley Industries, Inc.

MARVEL, Vice Chancellor:

Approximately two hundred and fifty former minority stockholders of Schenley Industries, Inc., whose rights as stockholders have been abolished (except for their right to have their shares of stock appraised) as a result of the June 17, 1971 merger here complained of, now seek a review of an appraisal of their shares made by a Court-appointed appraiser. Such stockholders having made timely and otherwise adequate objection to such merger as well as a correct demand for payment for their shares, thus qualified for such appraisal. They have now filed exceptions to the appraiser's final report, claiming that the values fixed by him were too low. Schenley has also excepted to such appraisal, contending that the appraiser's fixing of values for its minority stock here in issue was too high.

In passing on the value of shares of stock of those dissenting stockholders of Schenley Industries, Inc. who had declined to accept their company's offer of cash and debentures in exchange for their Schenley stock, the appraiser fixed a value of $43.87 for each share of Schenley common stock and $39.48 for each share of such corporation's convertible preferred stock, the latter having a stipulated value of %oths of the former.

This is the opinion of the Court on exceptions to the appraiser's report as well as on the appropriate amount of interest to be added to the sums to be allowed to those excepting stockholders who have qualified for an appraisal of the value of their shares, 8 Del.C. § 262(f) and (h).

On June 17, 1971, Schenley Industries, Inc. and Glen Alden Subsidiary Corp., Inc., a wholly-owned subsidiary of Glen Alden Corporation expressly organized for the purpose of accomplishing the merger here complained of, pursuant to the terms of an agreement of merger, were merged, with Schenley surviving as the resulting corporation. The formal decision to merge such corporations had been announced on February 24, 1971.

Prior to the merger complained of Glen Alden Corporation had become the holder of 86% of the common stock of Schenley as well as the holder of 84% of all of the shares of such corporation entitled to vote, the classes of such corporation's stock, other than its common, being a cumulative preference stock and a $1.40 convertible preferred stock carrying a right to have each such share converted to one share of common stock.

As a result of the merger complained of, Schenley's cumulative preference stock remained unaffected, however, the other two classes of Schenley stock, namely its common and convertible preferred stock were cancelled and retired. Under the terms of the merger plan Schenley's minority common shareholders were offered a cash pay-

ment of $5.00 per share together with a 7½% Glen Alden debenture in the principal amount of $30 due 1985 in exchange for their shares, while each holder of shares of Schenley preferred convertible stock was offered $4.50 in cash per share together with the equivalent of a principal payment in the amount of $27.00 per share in the form of the aforesaid 7½% debentures.

The minority stockholders, who now except to the appraiser's findings of value for their stock, having declined to accept Glen Alden's exchange offer, as noted above, thereupon proceeded to perfect their right to have their Schenley stock appraised, a right preserved to them by the provisions of 8 Del.C. § 262(k) inasmuch as the nature of the exchange offered to such objecting stockholders for their Schenley stock did not consist of a class of securities, the holding of which under the applicable terms of the statute now bars an exceptant to a merger to a right to an appraisal of his shares.

On September 17, 1974, the appraiser filed his final report fixing the values above stated, and exceptions having been taken to such report, the basic questions presented for decision are namely, that of the intrinsic value of the common stock as well as that of the convertible preferred stock of Schenley, and finally the appropriate rate of interest, if any, to be allowed to those Schenley stockholders who perfected their right to an appraisal of their shares and are still awaiting payment therefore.

The genesis of this litigation is found in the acquisition on March 20, 1968 of 1,467,689 shares of common stock of Schenley Industries, Inc. by Glen Alden Corporation from Lewis M. Rosensteil, the then chief executive officer of Schenley, and a small group of investors associated with him, at a price of $53.33 per share, the agreement of purchase and sale of such shares reciting that it was the intention of the parties that the remaining minority holders of Schenley common stock were to

be afforded an opportunity to sell their shares to Glen Alden at a price comparable to or more favorable than the price paid to Mr. Rosensteil and his group of investors for their shares of Schenley. In fact, it appears that Mr. Rosensteil insisted as a condition to the sale of his Schenley stock that other Schenley stockholders be made essentially the same offer.

Thus, pursuant to such express intent, on August 8, 1968, Glen Alden made a formal offer to purchase the common stock of the remaining minority shareholders of Schenley on the basis of a formula, which, on acceptance, would result in a price being paid of approximately $53.10 for each share of common stock of Schenley offered for sale. And, as a result of purchases of Schenley stock by Glen Alden during the period from March 20, 1968 through September 1, 1968 not only from Mr. Rosensteil and his group but from other stockholders who tendered their shares as well as through purchases in the public market, Glen Alden, as noted above, became the holder of approximately 86% of the common stock of Schenley.

The August 8, 1968 formal offer of Glen Alden to purchase Schenley stock of Glen Alden, also stated:

"After completion of the Exchange Offer, Glen may (subject to future conditions) make a further tender offer to the remaining holders of Schenley common stock or propose to combine Glen Alden and Schenley. In connection with any such further tender offer of combination, the consideration to be received by the holders of Schenley common stock who have not accepted the exchange offer may be more than, less than, or the same as that provided for in this exchange offer."

Why such offer was not more generally accepted by minority stockholders of Schenley in light of its amount and the clear message contained in such offer is not clear on the present record.

Schenley was incorporated in 1933, and its principal business has since been the distilling, importing and sale of spiritous beverages. Schenley sells its domestic and imported spiritous beverages under brand names, and although it markets a full-line of alcoholic beverages, it has concentrated its domestic production principally on bourbons and blended whiskies. Schenley also sells certain wines and manufactures and markets barrels. It also processes farm feeds, the latter being a relatively insignificant part of its business. It is also the sole importer and distributor of Dewar's Scotch whiskey, under a three year non-transferrable franchise which has been renewed regularly to date. This franchise is extremely profitable, Dewar's accounting for approximately 25–20% of Schenley's gross profits after expenses. In 1964, Schenley also acquired a controlling interest in Buckingham Corporation which owned the exclusive rights to distribute Cutty Sark Scotch whiskey in the United States.

As is the case in the distillery business generally, Schenley ages its whiskies, production being scheduled to meet the public demand for matured whiskies. Accordingly, inventories and carrying costs are necessarily larger vis à vis sales and total assets than in most other industries. In addition, at the time of the merger in issue there was substantial idle plant capacity throughout the liquor industry, there having been a chronic industry-wide surplus of domestic whiskies dating from the Korean War, the inception of which brought about over-production of domestic liquors due to the fear of the imposition of government controls of the production of alcoholic beverages for civilian use.

By 1950, Schenley had become one of the nation's leading full-line whiskey producers and distributors. But thereafter and into the mid-1960's a falling off took place in its business, which is intensely competitive, and Schenley's position in its field began to decline. And while Schenley continued to earn a profit each year during this period, the popularity of several of its more popular brands began to slump seriously. Such decline in Schenley's competitive strength was naturally reflected in the market price of its common stock which over the period from 1960 until 1966 never exceeded $29\frac{3}{8}$ per share and at one point dropped as low as $10\frac{3}{8}$ per share.

During this period of business decline, however, Schenley was accumulating inventories and accounts receivable in excess of those of distillers generally, such accumulations of inventory and receivables carrying a prospect of an eventual strong [1] cash position for such business. Furthermore, the potential market for certain of Schenley's less popular brands also tended to make Schenley a likely take-over prospect. Such economic conditions set the background for a battle between Lorillard and Glen Alden for acquisition of control of Schenley, a contest which culminated in the above noted take-over of Schenley by Glen Alden through acquisition of more than 80% of its voting stock, an accomplishment which led inexorably to the merger now complained of.

The present stockholder exceptants in this consolidated action, the principal ones being Dade & Co. and Bank of America, did not, of course, exchange their stock in response to the 1968 tender offer of Glen Alden, and now contend that the price of approximately $53 per share paid to the Rosensteil group and others responding to Glen Alden's offer for tenders, in effect represents a minimum price which may not be penetrated in reaching a judicial determination as to the values of the Schenley

1. However, it should be noted, according to Graham, Dodd, Cottle & Tatham, Securities Analysis, p. 519.

"Some companies sell at too low a price because their cash assets are too large. This sounds like a paradox, but a moment's thought will show that the statement can be true. Market price depends chiefly on earnings; cash assets bring in no earnings or very little."

stock here in issue. However, exceptants may not, in my opinion, be allowed to minimize the fact that Lorillard and Glen Alden, by engaging in a battle to acquire control of Schenley in the mid-1960's, drove up the market price of the common stock of such corporation beyond its true market value,[2] the price of Schenley fluctuating wildly depending on current rumors as to the possibility of Schenley being acquired. In other words, it appears to have been recognized in the financial world during such period that Schenley, which, as noted above, at the time not only held excessive reserves of aged whiskies and was in fact profiting principally from the sale of a relatively few of its popular brands, but also held an inordinate amount of accounts receivable and was in a potentially strong cash position, which promised to become stronger, stood out as a likely target for acquisition. In short, Glen Alden, under the direction of its chief executive officer, Meshulam Riklis, as well as Lorillard, apparently independently came to the conclusion that Schenley was a potentially large generator of cash, a fact which after much backing and filling, ultimately resulted in a decision by Glen Alden that the purchase of Schenley's common stock for approximately $53 per share constituted an exercise of sound business judgment, a decision, which, as noted above, was effectuated. As matters transpired, the expectations on realizing cash from the disposal of Schenley's inventories and the collection of its receivables were over-estimated. By the merger date, Schenley's inventory had been reduced in an amount of $144,000,000 less than had been anticipated while receivables had actually increased to an estimated amount of $114,000,000.

The exceptant Dade argues, however, that the settlement of charges as to the fairness of the price of $53.33 offered by

Glen Alden to Mr. Rosensteil and his group for their shares of Schenley, reached in the case of Sanders v. Riklis (Supr.Ct. N.Y. County) Index No. 7206– (1968) bars Schenley from questioning such price per share on the basis of principles of res adjudicata and estoppel despite the fact that Schenley was not a party to such litigation.

I am satisfied, however, that not only was the basic issue in the case of Sanders v. Riklis, supra, namely that of whether or not Glen Alden's decision as to the reasonable amount to pay for shares of Schenley stock in order to gain control of such corporation, governed by the business judgment rule, an issue at odds with that presented here, which is that of the fair value of dissenting shares in a merger proceeding, more to the point Schenley was not a party or privy to the New York litigation relied on by exceptants. In short, I am satisfied that inasmuch as Schenley was not a subsidiary of Glen Alden at the time of the acquisition complained of, or otherwise a participant in such litigation, it is not barred by the doctrines of res adjudicata or estoppel from taking the position that the price paid for Schenley shares by Glen Alden in 1968 does not bar Schenley from seeking to establish that the price of approximately $53 per share was not the floor for the value of Schenley common stock as of the time of the merger here under attack, Root v. York Corporation, Del. Ch., 29 Del.Ch. 351, 50 A.2d 52 (1946), this appraisal proceeding being an independent action in which established rules for determining the value of the stock held by dissenters to a merger apply.

The appraiser reached the following conclusions as to the intrinsic value of each share of common stock of Schenley Industries, Inc. as of June 17, 1971, the date of

---

2. See Voege v. Smith (S.D.N.Y.) 329 F. Supp. 180 (1971), and Greene & Co. v. Schenley Industries, Inc., Del.Ch., 281 A.2d 30 (1971). In fact, many of the contentions made by exceptants here evoke the feeling of déjà vu in light of the rulings in the cited cases.

merger, on the basis of the following valuations and weightings.

| | value factors | weight | assigned value |
|---|---|---|---|
| market | $29.00 | 35% | $10.15 |
| earnings value | $52.78 | 45% | $23.75 |
| asset value | $49.83 | 20% | $ 9.97 |
| | | | $43.87 |

Applying the same formula to Schenley's preferred convertible stock on the basis of its having a worth equivalent to 9/10ths of that of the Schenley common stock, the appraiser gave an appraised value of $39.48 to each such share.

The task before the appraiser and that now before the Court is summarized in the case of Tri-Continental Corp. v. Battye, Del.Supr., 31 Del.Ch. 101, 74 A.2d 71 (1950).

"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value."

See also In Re Olivetti Underwood Corporation, Del.Ch., 246 A.2d 800 (1968).

Turning first to market value, it must first be noted that since the decision in Chicago Corporation v. Munds, Del.Ch., 20 Del.Ch. 142, 172 A. 452 (1934), a case decided in an atmosphere of severely depressed market values of corporate shares of stock on a scale much more extreme than that being experienced now, it is established Delaware law, unlike that of New York for instance, that notwithstanding the 1967 amendments to the Delaware Corporation law, which abolished the right to an appraisal for shares registered on a national securities exchange or held of record by more than two thousand shareholders, that market value alone is not controlling in a case such as this in light of the nature of the exchange offer which the excepting stockholders declined, although market price alone, is of course, " * * * worthy of high weight * * *" since the market is where the investor would make or lose money on his investment, In re Olivetti Underwood Corp., supra. See also Greene v. Schenley Industries, Inc. supra.

However, the question to be answered at the present juncture of this litigation is what was the fair market price for Schenley common stock as of June 17, 1971, the date of merger " * * * exclusive of any element of value arising from the expectation or accomplishment of the merger or consolidation * * *" 8 Del.Ch., § 262(b). Compare Levin v. Midland-Ross Corporation, Del.Ch., 41 Del.Ch. 276, 194 A.2d 50 (1963).

The stockholder exceptants, as noted earlier, contend that the market price created by the Glen Alden-Lorillard battle for control of Schenley, which culminated in 1968, and resulted in the acquisition of 84% of the voting stock of Schenley by Glen Alden constitutes a market value for such corporation's stock unaffected by the merger complained of and thus constitutes a floor for valuation of such stock, arguing that the decline in the market price of Schenley stock thereafter ensuing was due to the inevitability of the present merger. I am satisfied, however, that in arriving at a market price unaffected by the merger

announcement, the Court may not turn back to a period of three years prior to the announcement of the merger in dispute to an extraordinary time when all minority common shares of Schenley were sought to be acquired at a price of approximately $53 per share, the fact that more than the market price for stock is often paid for control being recognized in the corporate world. Compare Sterling v. Mayflower Hotel Corp., Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952), Adams v. R. C. Williams & Co., Del.Ch., 39 Del.Ch. 61, 158 A.2d 797 (1960), and Sporborg v. City Specialty Stores, Inc., Del.Ch., 35 Del.Ch. 560, 123 A.2d 121 (1956), cases in which it is recognized that the price paid for a particular block of stock may be inflated as the result of an effort to take over control. See also In Re Olivetti Underwood Corporation, supra, in which the purchase of minority shares by what ultimately became the resulting corporation in a merger occurred three years before the merger complained of, a price of $45 per share having been paid to certain minority stockholders in order to obtain control. Notwithstanding the existence of a temporarily inflated market for such stock, the Court held that an appropriate market price, namely that existing immediately prior to formal announcement of an intention to merge constituted the market price of such shares for appraisal purposes, namely $14.25 per share. I accordingly accept the appraiser's estimate of the market value of Schenley common stock, an issue which was widely traded on the New York stock exchange over the years here involved up to the time here in issue to have been correct, and I adopt it.

Although both the stockholder exceptants and the corporation agree on the basic approach to be followed in determining earnings value in an appraisal proceeding, they disagree, for different reasons, with the result of the appraiser's analysis.

The appraiser calculated the average earnings per share for Schenley common stock for the five year period from 1966 through 1970 as follows:

| fiscal year | earnings per share (computed on a fully-diluted basis) |
| --- | --- |
| ending August 1966 | $2.26 |
| August 1967 | $2.53 (includes extraordinary gain realized on sale of real estate) |
| August 1968 [3] | $2.04 |
| December 1969 | $2.45 |
| December 1970 | $9.56 (includes $6.92 extraordinary gain realized on 1971 sale of Buckingham) |

The appraiser included in his figures not only the operating earnings of Schenley and Buckingham but also the extraordinarily large gain realized from the sale of Buckingham in May, 1971. Schenley objects to the inclusion in average earnings of the extraordinary Buckingham gain as well as a $.16 gain on the sale of real estate.

Schenley argues that it did not, in fact, regularly enjoy extraordinary earnings and that, in any event, only earnings flowing from normal business operations should be included in an average earnings figure, and that since both the Buckingham and real estate sales were extraordinary, they must be excluded. It also complains that as a result of including the Buckingham gain in the average earnings figure, the appraiser valued the entire Buckingham component of Schenley at over $30 per

3. The appraiser used the audited figures reported in Schenley's May, 1971, merger proxy statement but excluded earnings from September through December, 1968, a four month stub period in which Schenley shifted its accounting period from a fiscal year ending in August to a calendar year basis. Apparently, he reasoned that the figures reported for the stub period might not reflect proper year-end adjustments and that only earnings data for full fiscal years should be used. He rejected Schenley's offer of figures for the precise five-year period immediately preceding the merger (May 31, 1966 to May 31, 1971) which were broken down into four fiscal years and three stub periods. As noted, later, I believe that the appraiser should have recognized the traditional five year period preceding the merger.

share when its true value, as evidenced by the sale price Northwest Industries paid, was only $13 per share, pointing out that the Buckingham sale price itself represents merely the capitalized value of past earnings. Thus, by including both the Buckingham gain and operating earnings in the five-year figure, the appraiser erroneously counted Buckingham's earnings twice and capitalized an already capitalized figure.

■■ It is established as a general rule that in order to arrive at a fair estimate of earnings value in a merger proceeding, corporate income should be averaged over a period of five years preceding the merger in question, In Re Olivetti Underwood Corporation, supra, the purpose in averaging earnings over such a period being characterized as a means of minimizing the impact of untypical profits and losses over a period of years, Adams v. R. C. Williams & Co., supra. Furthermore, I see no reason why during such period full years should not be considered in order to arrive at " * * * average earnings over the five-year period immediately preceding the merger." Application of Delaware Racing Association, Del.Supr., 213 A.2d 203 (1965). In short, I am satisfied, on the present record, that the appraiser's finding of a figure[4] of $2.38 ordinary average earnings per share for Schenley during a five year period preceding the merger, excluding the extraordinary gain realized from the sale of the Buckingham franchise but including the $.16 gain, is correct.

Where the exceptants and Schenley drastically part company as to what should be deemed to be Schenley's earnings over an appropriate period is over the appraiser's treatment of the capital gain realized by Schenley as a result of the sale of Buckingham Corporation in the amount of $71,130,000 as well as his treatment of the

income realized from the operation of Buckingham Corporation prior to its sale, such sale having taken place as the result of the entry of a consent antitrust decree which required Schenley to divest itself of its exclusive franchise to market the extremely popular Scotch whiskey Cutty Sark, which franchise, until terminated by court decree, would otherwise presumably have continued until the year 2000. The appraiser, by his treatment of the Buckingham transaction, namely by including the gain derived from such sale as earnings and thereafter applying a multiplier to capitalize such capital gain, increased his estimate as to Schenley's estimated earnings to $52.78 per share.

Schenley argues that while good and bad years must, of course, be included in reaching an average of earnings over the traditional five year period, extraordinary transactions, which are not related to normal business operations, are customarily excluded from earnings in an appraisal action. See Adams v. R. C. Williams & Co., Inc., supra, in which the Court distinguished between the act of excluding from earnings unusual and extraordinary transactions and the inappropriate action of the appraiser in that case in restricting the number of years for averaging earnings to the two years immediately preceding the merger solely on the ground that the company had had substantial savings in such years. The reviewing Court stated:

"The Court would add that there could of course be elements of value included in earnings which would be considered so unusual and isolated as to justify their elimination in calculating average earnings. However, I am satisfied that it would take a most unusual situation to justify the limiting of the average number of years to the short period [two years] employed by the appraiser."

4. 1966–$2.26  
   1967–$2.53  
   1968–$2.04  
   1969–$2.45  
   1970–$2.64  
   Average $2.38

The record reveals that the Buckingham sale was not only a sale of a major branch of Schenley's business but on a scale many times larger than past extraordinary sales of assets. Thus, the appraiser listed extraordinary earnings from three previous sales occurring in 1964, 1965, and 1967, in which the earnings per share averaged $.36 on a non-diluted basis. Earnings per share on the Buckingham sale were $8.99 on a non-diluted basis, almost twenty-five times larger. They will be excluded from the averaging of earnings over the period in question while the Buckingham earnings prior to the sale will, of course, be included in the computation of average earnings. See also Francis I. duPont & Co. v. Universal City Studios, Inc., Del.Ch., 312 A.2d 344 (1973), aff'd, Del.Supr., 334 A.2d 216 (1975) in which it was held that it would be most unusual for an appraiser to be justified in either limiting or expanding the number of years to be used for averaging earnings and that unusual and isolated transactions should be excluded from earnings. Other cases on this point are In re Olivetti Underwood Corporation, supra, Swanton v. State Guaranty Corporation, Del.Ch., 215 A.2d 242 (1965), and Stryker v. Brown, Del.Ch., Civil Action No. 1945, Unreported Opinion (1965). See also Graham, Dodd, Cottle & Tatham, Securities Analysis, p. 112, in which it is stated:

"We should exclude also (from earnings) a profit or loss from a major sale of property, considering it not related to the company's operations but smaller and repeated sales of fixed assets could be regarded, contrariwise as incidental to a continuing business."

And while the appraiser preliminarily was of the view that " * * * extraordinary earnings seem to be the rule rather than the exception with Schenley * * * ", there appears to have been only one other extraordinary gain achieved by Schenley during the five year period in question, namely a gain of sixteen cents per share in 1967 realized from the sale of real estate, or a five year average of three cents per share and he noted in his final report that including the Buckingham gain " * * * may be unfair and misleading." The 1967 gain, however, appears to have been in line with other similar transactions, such as the 1971 sale by Schenley of a California wine subsidiary, and accordingly will be included in earnings.

Next, in view of the obvious reluctance of Schenley to be divested of its money-making Buckingham franchise, I fail to find any acceptable indication in the present record of a preconceived scheme of Schenley to injure the rights of its minority stockholders by allegedly timing the Buckingham sale so that it would take place as a corollary to the 1969 merger of Schenley and BHM Industries, Inc. under the terms of which Buckingham shareholders were issued Schenley convertible preferred shares and whose rights were thereby affected by the eventual Schenley-Glen Alden merger. The ordinary earnings of Schenley noted earlier in this opinion including, $.16 per share realized on the 1967 sale of real estate, will therefore be considered in this appraisal proceeding and the extraordinary Buckingham sale excluded.

The appraiser initially adopted exceptants' suggested multiplier of 20.2 for earnings but lowered it to 14 in order to compensate for the inclusion of the Buckingham capital gain and to reflect additional plus and minus factors peculiar to Schenley. Exceptants have selected as businesses comparable to Schenley the eight liquor companies, excluding brewers, included in the S.E.C. Beer and Liquor Industry Classification.[5] Schenley attacks the appraiser's selection of these companies

5. The companies are: Distillers Corporation, Seagrams, Hiram Walker, Heublein, National Distillers, American Distillers, Barton Brands, Brown-Forman, and Glenmore.

as comparables, arguing that Distillers Corporation, Hiram Walker, and Brown-Forman are in fact Schenley's three principal competitors, such businesses being most similar to it in product lines. However, I am satisfied that the appraiser's use of a broad industry-wide spectrum of companies was within the range of reason. First of all, the appraiser's observation that Schenley's own experts had adopted the same companies as comparables in related past litigation in itself supports his choice. Additionally, as I read the case of Universal City Studios, Inc. v. Francis I. duPont & Co., Del.Supr., 334 A.2d 216 (1975), such decision permits the use of companies operating within the same industry although they may only compete to a limited degree.

Schenley also attacks the appraiser's method of arriving at price-earnings ratios by comparing average five year earnings with merger date prices, contending that such method has no precedent in the case law and distorts some comparable multiples to a point higher than their actual price-earnings ratios in any one of those years.

The holding of Universal City Studios, Inc. v. Francis I. duPont & Co., supra, is to the effect that since earnings value is to be determined as of the merger date, price-earnings ratios should be computed by reference to the merger date price in the absence of extraordinary deviation from the average price-earnings multiples over the previous five years. And although the appraiser's method has apparently not been used before in an appraisal proceeding, it is based on the merger date price and is not unreasonable. Additionally, there is no extraordinary deviation to be found in comparing the average of the comparables' past price-earnings ratios (16.9) with the appraiser's ratio (20.-2). Moreover, I am satisfied that the appraiser adequately considered Schenley's prospects and trends in addition to its own historical price-earnings ratio in finally

arriving at a multiplier of 14. But inasmuch as the Buckingham gain has been excluded from earnings the multiplier should, in my opinion, be increased to 16.72 [6] which was the Standard & Poor's Distiller's Index as of the merger date and was suggested as an alternative by the appraiser in his final report. The selection of a multiplier in an appraisal action is always difficult and imprecise as is the entire procedure of appraisal. On the other hand, the recommendation of the appraiser should be followed when within the realm of reason.

Turning to the issue of asset value, which, I am satisfied, as was the appraiser, has nothing to do with either earnings value, the value of shares of stock in the market place, or with intangibles such as the value of Schenley's Dewar's Scotch whiskey franchise, Poole v. N. V. Deli Maatschappij, Del.Supr., 243 A.2d 67 (1968), the two principal stockholder exceptants contend that the value per share of Schenley's assets as of the merger date was in the range of $90 or more. Schenley, on the other hand, takes the position that the value of its assets as of the time of merger was less than their book value and should receive no independent weight, the book value of inventory at its carrying cost allegedly being $294,905,905, and Schenley's plants and equipment having a market value of $32,926,205, the figure arrived at by American Appraisal Company on the basis of an appraisal made by such organization on Schenley's request, and the only convincing evidence of appropriate value in the record before me.

The appraiser, on the other hand, found corporate assets to have a value of $49.33 a share, having accepted the net tangible asset value per share as shown on the corporate balance sheet as of the merger date, namely $40.84, and adjusted that figure by adding or subtracting varying amounts so as to reach what he considered to be the

6. Compare Universal City Studios, Inc. v. Francis I. duPont & Co., supra.

fair market value of each category of assets.[5]

■ First of all, I agree with the appraiser's conclusion that asset value may not be determined by adding to Schenley's book value the average premium over book which stock market investors would reasonably pay for the stock or assets of comparable companies. Market and acquisition prices presumably reflect an allowance for the value of a business as a going concern as opposed to the value of physical plant, and neither is an accurate measure of the fair market or theoretical liquidating value of Schenley's assets, Poole v. N. V. Deli Maatschappij, supra.

■ I also reject the contention that Schenley's expert witness' testimony as to the fair market value of twenty-eight Schenley plants, which he did not personally inspect, should not be considered. Schenley retained American Appraisal Company to appraise the value of its physical plant, and sixty employees of such corporation, in addition to the witness, Mr. Gross, inspected thirty-three plants of Schenley located throughout this country and Canada. And while Mr. Gross personally inspected only five of such plants, his opinion as to the value of the other twenty-eight was derived from data gathered by his subordinates all of whom used a common method prescribed by their supervisor in arriving at their conclusions. Such information was, I think, properly relied on by Mr. Gross.

■ Next, exception is taken to certain of Schenley's answers to interrogatories which the appraiser did not request until after the appraisal hearing. The exceptant Dade claims that since it had no opportunity to cross-examine as to the accuracy of such answers, the data was hearsay. How-

ever, 8 Del.C. § 262(e) gives the appraiser great latitude in seeking data to aid him in the valuation process. In re General Realty & Utilities Corp., Del.Ch., 29 Del.Ch. 480, 52 A.2d 6, 11 (1947). Thus, he may " * * * examine any of the books and records of the corporation * * * " and his conclusions may be based " * * * upon such investigation as to him seems proper * * * ". I conclude that the appraiser, in reaching his determination as to value, properly took into account Schenley's answers to interrogatories as to asset value.

■ As to inventory, which was carried on Schenley's books at $294,000,000, I reject Dade's argument that inventory should have been valued as if sold in a unit with brand names, plant and property to another distiller or group of distillers who would continue to produce and sell Schenley brands. The case of Poole v. N. V. Deli Maatschappij, supra, is authority for the proposition that no allowance may be made for the value of a business or for the earning power of assets. Nonetheless, a sale of substantially all of Schenley's assets, including brand names, which largely symbolize goodwill, as a unit to another distiller is essentially no different than a sale of the entire business, and the price undoubtedly would reflect an improper allowance for the value of the business. On the other hand, I am satisfied that the appraiser erred in valuing bulk inventory as if it could be sold as a unit on the bulk sales market.

However, in light of the fact that I have concluded, in this stock appraisal case at least, that asset value has little or no meaning in arriving at a determination as to the intrinsic value of the shares of corporate stock in issue (this case presenting a situation in which many of the Schenley

---

5. His adjustments were as follows:

| | | |
|---|---|---|
| (1) book value | $ | 40.84 |
| (2) inventory | $ | 5.72 |
| (3) plant and property | $ | 4.30 |
| (4) inventment in Seager-Evans | $ | (.95) |
| (5) investment in Glen Alden 6% debentures | $ | (.08) |
| Total | $ | 49.33 |

distillery buildings were at the time of merger being used solely for storage of barrels and the like, and in which I have decided that the Dewar's franchise for Scotch whiskey, being nontransferrable, had no real sales value, Poole v. N. V. Deli Maatschappij, supra) it would serve no useful purpose, in my opinion, further to extend this already lengthy opinion by analyzing the parties' divergent views as to the value of Schenley's assets as of the time of merger.

■ In other words, the investing and trading public, in reaching a judgment as to the value of corporate shares, gives consideration to corporate assets only insofar as they disclose a capability of generating earnings, a judgment exercised here, and I am satisfied that there is no possible means of arriving at an approximation of the value of Schenley's assets as generators of earnings as of the time here in issue when Schenley had an overvalued inventory, containing a number of unpopular brands, and most of its twenty-nine distilleries and related plants were closed down. Accordingly, an appraisal of its assets as of such time would not, in my opinion, have served as a basis for reliance by a would-be investor in Schenley stock as of the time immediately prior to the merger here in issue, and will be given no weight here.

As stated in Graham, Dodd, Cottle & Tatham, Securities Analysis at p. 217:

"There is good reason for not taking the asset-value factor seriously. The average market price of a common stock over the years depends chiefly on the earnings power and the dividend payments. These, in turn, usually do not bear any close or reasonably consistent relation to the asset value. (While such relation may possibly be traced for corporations as a whole, the range in the case of individual companies is virtually unlimited). Investors and speculators have found that the asset value is typically no guide at all to earning-power value or average market price. Hence they have gradually come to give the asset-value factor practically no weight."

Thus, in the case of Francis I. duPont & Co. v. Universal City Studios, Inc., supra, asset value was given only a 12½% weight, which allocation of weight was affirmed on appeal. On the other hand, in cases such as In Re General Realty & Utilities Corporation, Del.Ch., 29 Del.Ch. 480, 52 A.2d 6 (1947), Swanton v. State Guaranty Corporation, Del.Ch., 215 A.2d 242 (1965), and Levin v. Midland-Ross Corporation, Del.Ch., 41 Del.Ch. 276, 194 A.2d 50, in which assets were given substantial weight, the first two cases were concerned with the holding of real estate, while the third one involved a company in liquidation as of the time of merger.

■ The right to an appraisal by holders of Schenley's convertible preferred stock must next be considered. Schenley's certificate of incorporation provides that each share of such stock is convertible into 9/10ths of a share of common, and the appraiser, after reaching a conclusion as to the value of Schenley's common stock, accordingly placed a value on such convertible preferred of 9/10ths of the value of the common. Both Schenley and the Bank of America, citing Jacques Coe & Co. v. Minneapolis-Moline Co., Del.Ch., 31 Del.Ch. 368, 75 A.2d 244 (1950), a case which was concerned with the rights on merger of the holders of nonconvertible preferred stock, argue that the appraised value of such preferred stock must be limited to its liquidation price of $24.00, as fixed in Schenley's corporate charter and that any value given to such stock in this proceeding over and above such liquidation price must be allocated to the common shares. The appraiser, in reaching a conclusion contrary to such contention, relied on § 1.09 of the Schenley corporate charter concerning the

effect on the convertible preferred here in issue of a merger. However, the section relied on applies only to a merger in which Schenley is not to be the resulting corporation which it is here. On the other hand, § 1.03 of the Schenley charter, which provides for a $24.00 price liquidating payment for the convertible preferred, expressly stipulates that:

> " * * * Neither the merger nor the consolidation of the Corporation, nor the sale, lease or conveyance of all or part of its property and business as an entirety, shall be deemed to be a liquidation, dissolution or winding up of the affairs of the Corporation within the meaning of this Section 1.03."

Schenley argues that § 1.03 as the Schenley charter should be disregarded since appraisal value is to be determined as if a merger had never occurred, being " * * * exclusive of any element of value arising from the expectation or accomplishment of the merger [itself].", 8 Del.C. § 262(b). However, I do not think that § 1.03 of the Schenley charter should be deemed such an element of value here but is rather a contractual arrangement which makes the holding in Jacques Coe & Co. v. Minneapolis-Moline Co., supra, a case which was not concerned with convertible preferred stock, inapplicable here. The holders of the Schenley convertible preferred stock, in my opinion, are therefore entitled to a statutory appraisal of their stock at 9/10ths of the value assigned to the Schenley common shares.

Next, I shall consider the weight to be accorded the values assigned to market and earnings and on the basis of what I discern to be a trend which gives market value a significant role, greater weight will be given to such value than was customarily allotted in the cases which followed the strict rule of Chicago Corporation v. Munds, supra, a depression days ruling. I shall give a weight of 55% to Schenley's market price which I have found to be $29 per share as of the critical date. See Greene v. Schenley Industries, Inc., supra, Bastian v. Bourns, Inc. Del.Ch., 256 A.2d 680 (1969) aff'd 278 A.2d 467 (1970). In re Olivetti Underwood Corporation, supra, and Bruce v. E. L. Bruce Company, Del. Ch., 40 Del.Ch. 80, 174 A.2d 29 (1961), Contra Francis I. duPont & Co. v. Universal City Studios, Inc., supra, in which trading in the stock of Universal was found to be too thin to be used as an index of such stock's true value.

As to average earnings over the appropriate five year period, excluding the Buckingham sale, I have adopted the appraiser's average figure of $2.38 per share per annum, which will be multiplied by the selected multiplier of 16.72, for a total of $39.79. Such figure will be weighted as 45%.

The result is that the common stock of Schenley is found to have a fair value as of the time of merger of $33.86 per share and Schenley's convertible preferred stock a value of 9/10ths of the value of the common or a fair value of $30.47 per share.

As to the discretionary power of the Court to award interest to excepting stockholders, the recent case of Universal City Studios, Inc. v. Francis I. duPont & Co., supra, holds that the purpose behind the allowance of interest in an appraisal proceeding is to " * * * fairly compensate plaintiffs for their inability to use the money during the period in question * * *" and, accordingly " * * * it was proper to focus on what would have been the rate of interest at which a prudent investor could have invested money rather than . . . . on how much it would have cost the corporation to borrow the money." Interest to the excepting stockholders in the cited case was accordingly allowed at the rate of 5.23 per centum per annum on the basis of an average return from short, medium and long-term United States Treasury bills, savings de-

posits in commercial banks, savings deposits in mutual savings banks, Moody's Aaa corporate bond average, and the Dow Jones industrial average.

It is argued in opposition to such formula that the average yield to maturity on the 7½% debentures issued by Schenley in the merger exchange here in issue should be allowed to exceptants since such yield not only measures Schenley's cost of borrowing but also represents the average rate of return which lenders could expect to be paid by Schenley for borrowed moneys.

■ Schenley presented evidence establishing the expectation of an average annual return of 5.73% from the same type of investments which were used to fix allowable interest in the case of Universal City Studios, Inc. v. Francis I. duPont, supra. I find such rate of interest to be due and owing to the dissenting stockholders who have qualified for an appraisal of their stock in this proceeding on the appraised value of such stock.

An appropriate order may be presented on notice.