Charles L. SWANTON et al., Plaintiffs,

v.

STATE GUARANTY CORPORATION, a Delaware corporation, Allied Properties, a California corporation, Surviving Corporation, Defendants.

Court of Chancery of Delaware.

New Castle.

Oct. 22, 1965.

Howard M. Handelman, of Bayard, Brill, Russell & Handelman, Wilmington, and Walter H. Young, Los Angeles, Cal., for plaintiffs.

Joseph H. Geoghegan, of Berl, Potter & Anderson, Wilmington, and John L. Bradley, of Crimmins, Kent, Bradley & Burns, San Francisco, Cal., for defendants.

SEITZ, Chancellor:

Plaintiffs were preferred stockholders of State Guaranty Corporation ("Guaranty"), which merged into Allied Properties, a California corporation (both called "defendants"). Plaintiffs qualified for a statutory appraisal and the appraiser fixed $88.62 as the per share fair value. Both plaintiffs and defendants filed exceptions to the appraiser's report and this is the decision thereon.

Guaranty was incorporated in 1927. Apparently it has been and was at the merger date a real estate holding company and in-

vestment company which operated through its wholly owned subsidiary, Allied Properties. Allied owned, operated or leased three hotels, four farms and ranches, twenty commercial properties and held other large parcels of real estate for investment. These properties are located primarily in the growth areas of California, with some holdings in Arizona, Nevada and Oregon. It also has a substantial portfolio of securities of non-affiliated companies.

Guaranty has two classes of capital stock; no par noncallable participating preferred stock and no par common stock. The preferred, which has equal voting rights with the common, is entitled to cumulative cash dividends of $1.30 per share per annum, and on dissolution would receive $25.00 per share plus accumulated and unpaid dividends before any distribution to the common. Subject to the stated dividend and dissolution preferences, the common is entitled to a dividend of 13 cents per share per annum and to $2.00 per share on dissolution. From any dividends declared over and above $1.30 for preferred and 13 cents for common, the preferred is entitled to one and one-half times the amount of dividends payable to common. On dissolution, after the priorities of $25.00 plus dividend arrearages on the preferred and $2.00 on the common, the preferred is entitled to one and one-half times the amount paid to common.

Of 280,000 shares of authorized common, Guaranty has outstanding 271,867 shares, all owned by State Guaranty Auxiliary Corporation ("Auxiliary"). Auxiliary has issued and outstanding 271,867 shares of common stock of which (as of January 31, 1962) 139,881 shares (51 plus %) were owned by the President of Guaranty, Robert S. Odell, and his wife. As of December 31, 1961, Guaranty had 368,908 authorized shares of preferred. Of those issued, 130,294 shares were held by subsidiaries, 48,795 were treasury shares and 129,639 shares were outstanding and entitled to vote. Of said 129,-639 shares, at least 30,663 were owned or controlled by directors of Guaranty on January 31, 1962

Accumulated and unpaid dividends on the preferred amounted to $33.00 per share at the date of the merger. No dividends were paid on the preferred between 1931 and the second quarter of 1958. Since then, Guaranty has paid regular quarterly dividends at the rate of $1.30 per share per annum. No dividends have been paid on the common since 1931.

The statistical basis for the value fixed by the appraiser is as follows:

|  | Per Share |  | Weight |  |  |
|---|---|---|---|---|---|
| Asset Value | $ 128.08 | X | 50% | = | $64.04 |
| Earnings Value | 44.94 | X | 40% | = | 17.98 |
| Market Value | 66.00 | X | 10% | = | 6.60 |
|  |  | Appraised Value Per Share |  |  | $88.62 |

Preliminarily, I point out that because of the voting and dividend rights of the preferred, it can be here treated, as the parties and the appraiser have tacitly recognized, as though it were common stock being appraised.

■ I shall now consider defendants' first exception. They attack the 1960 earnings figure employed by the appraiser in the process of finding Guaranty's average earnings to be used in capitalizing earnings. It is admitted by plaintiffs that, apart from the attorneys' fee item which I shall next consider, Guaranty's 1960 earnings were $49,-376.64. In his draft report the appraiser omitted 1960 earnings altogether for reasons not now pertinent. Motivated by an exception to this aspect of his draft report, the appraiser decided to include and did include 1960 earnings in his final report. However, the appraiser adjusted the company's reported 1960 earnings upward by some $225,000. This item represented $225,000 paid by Guaranty in 1960 for legal expenses incurred several years before. The appraiser apparently thought this item had been deducted by Guaranty in computing its 1960 income. He felt that the amount should be restored to give a true picture of 1960 earnings, since the charge represented a nonrecurring expense incurred several years earlier. However, the fact is that the $225,-000 was not deducted from 1960 earnings. Rather, it was charged to a special reserve which had been created in 1951. Thus, other factors aside, the factual basis for the appraiser's treatment of the item was nonexistent. Thus, in finding average earnings, $49,376.64 must be employed as Guaranty's 1960 earnings. When this adjustment is made, Guaranty's average per share earnings amount to $3.09.

■ I next consider defendants' claim that Guaranty's average earnings should have been capitalized by a factor of 7 and that the appraiser erred in using a multiplier of 14.

Defendants say their contention is supported by the Delaware cases and Professor Dewing's work on "The Financial Policies of Corporations" (5th ed.). They say, in any event, that the high multiplier employed by the appraiser was not warranted on the basis of either the type or earnings of the corporation involved. In predictable contrast, plaintiffs say the multiplier is too low and should have been about 20. Plaintiffs contend that the use of this number is justified on the basis of the price-earnings ratio of stocks generally in this area, but in any event because of Guaranty's policy of buying or holding a great portion of its assets for capital appreciation rather than ordinary income. They say that the only logical place under the present facts to recognize the future growth factor (in the form of capital appreciation rather than

ordinary income) is by the employment of a higher multiplier than might ordinarily be justified.

This argument brings the court to the vital problem in this case, viz., the treatment of the financial consequences of Guaranty's investment policy. It is apparent and not contested that the management of Guaranty has, over the years, operated the corporation with an emphasis on holding a large percentage of its assets for capital growth rather than income. Thus, it has purchased substantial amounts of non-income producing real estate and has used most of its income from other assets to cover expenses on all the properties and also to purchase some of the outstanding preferred stock. This policy has obviously been successful, as the admittedly very substantial increase in asset value reveals. Thus, many of Guaranty's properties are located in the great boom areas of California. Much of such real estate is either vacant land or produces minimal income. Yet its fair value has increased tremendously. Indeed, almost half of Guaranty's asset value is found in this general category.

Where a company follows an investment policy which looks to appreciation of capital rather than generation of ordinary income, should the value resulting from such policy be specially considered in arriving at appraised value, and if so, where? The capital appreciation investment policy of Guaranty, presumably motivated in part by tax considerations, suggests that placing undue weight in this appraisal proceeding on the normally important earnings factor would give a false picture of the intrinsic value of Guaranty's stock. The same would be true if dividends were emphasized. Also, to the extent the "market" apparently valued this stock on the basis of earnings and dividends, it clearly did not give full recognition to its going concern value. This may be in part because the full facts concerning value were apparently not a matter of public knowledge generally.

I therefore conclude that where, as here, the record solidly supports a prediction of further appreciation, it is entitled to significant consideration. Thus, such appreciation potential must be considered either under the earnings or the asset classification. Since the average earnings, which are a part of the earnings element are based on past earnings, it is evident that an important factor in arriving at this element is the multiplier to be employed. It is, of course, possible to raise this multiplier. However, it is evident that earnings can be so depressed as a consequence of corporate investment policy, that an application of a multiplier thereto may be completely unrealistic in reflecting the value. In that situation the growth potential (as a substitute for earnings potential) might have to be given recognition by giving greater weight to present asset value. Certainly, in any case, the appraisal procedure is sufficiently flexible to provide the mechanics for arriving at the intrinsic value of stock however reflected.

I conclude that the earnings picture of Guaranty, though not of pervasive importance here, is sufficiently reliable to use as the basis for giving some recognition to the future capital appreciation prospects of the company. Compensation can be made for the low average earnings resulting from the company's investment policy by raising the capitalization rate. In deciding on an earnings multiplier of 14 the appraiser obviously considered that future "earnings" should embrace some possibility of the ultimate realization by the stockholders in some form of the appreciation prospects of the approximately 50% in value of its non-income producing assets. The record supports the importance of the potential appreciation here. The question is whether a multiplier of 14 is within the range of reason under the circumstances.

If I were considering the ordinary business corporation and attempting to arrive at its earnings value, the process would be simpler. I say this because the capital

appreciation investment policy would not be significantly involved. Here it is most important and I take notice that this policy is not particularly unusual in many American corporations, particularly where controlling shareholders are few in number. But defendants say no case has employed a multiplier greater than 10 and that Professor Dewing's chart only applies that factor to the "best" grade corporations. As Dewing himself intimates, his chart of capitalization rates was not intended to freeze the subject matter for all time. Indeed, a little contemporary financial history shows the need for flexibility. But assuming that in the ordinary situation a corporation would not be entitled to a capitalization rate of 14, I am satisfied that such a factor is appropriate here to give some effect to the capital appreciation potential created here as a matter of corporate policy. Since the multiplier of 14 is within the range of reason under these special circumstances it will not be disturbed. Therefore, taking the corrected average earnings at $3.09 and applying a multiplier of 14, I conclude that the earnings value for appraisal purposes is $43.26.

The defendants agree with the 40% weight given earnings by the appraiser. The plaintiffs say it is too high considering Guaranty's policy with respect to investments generally. The weighting of this factor must be considered in conjunction with the appraiser's weighting of asset value at 50%. The defendants agree with the 50% weight given assets by the appraiser while plaintiffs say it should be substantially higher in view of the fact that much of Guaranty's value is reflected in unrealized but present appreciation of its assets resulting from its investment policy.

To repeat, this is not the ordinary business corporation whose value must arise in large measure from its ordinary earnings potential. Here the capital appreciation policy has succeeded. One cannot say that a stockholder is to be deprived of the benefit of that policy because of a merger. But if the stockholder is to obtain any meaning-

ful benefit from this successful corporate policy up to this point, asset value must be weighted heavily. This is done not on the basis of a liquidation approach but because it is in this element at this time in the corporation's life that a very substantial portion of the intrinsic value of the shares is to be found.

Defendants emphasize that no reported Delaware case has weighted asset value at more than 50%. Like Professor Dewing's capitalization chart, such a fact is not the "be-all and end-all" here. The court's apparent deference to the 50% figure in Levin v. Midland-Ross Corp., (Del.Ch.), 194 A.2d 50, is not and indeed, considering the subject matter, could not be considered a rule of law.

■ I conclude that asset value here should be weighted at 60% rather than at the 50% figure used by the appraiser. In this way the stockholders will more likely receive the benefit of this element of value which was created by an investment policy directed to that end.

■ I further conclude that the 40% weight attributed by the appraiser to earnings value should be reduced to 30%. I do this because of my conclusion as to the relative importance here between asset value and earnings value, and with due allowance for the factors I have already considered in arriving at what in effect amounts to future earnings element of value.

■ The appraiser weighted market value at 10%. Defendants agree with the market value figure employed and the weight given it. Plaintiffs say it should have been weighted at only 5%. There was a market here but it was influenced somewhat by the company's buying of its own stock. I have reviewed the matter and I conclude that the weighting of market value at 10% should stand. I say this because, in one sense, it reflects some opinion, however unsophisticated, as to the worth of the stock. Also, I believe this factor tends to reflect the poor dividend record of the

company, even though that record was the result in part of corporate policy. Because of these factors and the record generally, I conclude that the dividend record, rather than being given independent negative weight, as contended for by defendants, is amply reflected in the weight given this market value.

I come next to the question of interest. As the cases indicate, this is a matter for the court rather than the appraiser.

 The defendants say that interest should be decreased because of the excessive price demanded by plaintiffs prior to the commencement of the appraisal proceedings. Plaintiffs say they demanded nothing but that defendants offered substantially less than the appraised value. The appraised value does substantially exceed the amount offered by defendants. I can find no factual basis for penalizing plaintiffs by denying them interest during the period when the corporation in effect had the use of their money.

I next consider the rate of interest. Defendants say it should be limited to 4% which they claim is the Federal Reserve loan rate. Plaintiffs say the California legal rate of interest (7%) would be proper because of the connection of the parties with that State. The appraisal statute is controlling and it requires this court to exercise a discretion in fixing the rate of interest. This means that the parties could have offered evidence to assist me in fixing the rate. They did not do so. Rather, in effect, they indicated that they would be guided by my independent judgment if I did not accept their contentions. I note that in Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278, I fixed the interest at 4¾%. That was in early 1960. I feel that the cost of money has risen somewhat since then and conclude that a reasonable rate here would be 5%. If the parties desire to make a further record on this point, I will entertain such an application.

Defendants say that no interest should be allowed during the period when plaintiffs were allegedly guilty of inexcusable delay in prosecuting the proceedings. This period covered several months but I cannot find that the delay was so unwarranted on this record as to justify depriving the clients of interest during such period.

Finally, defendants argue that the costs should be divided equally between plaintiffs and defendants. I note preliminarily that the parties do not disagree as to the propriety of the charges which are included in the costs here involved. The costs are ordinarily assessed against the corporation and I can find no reasonable basis for apportioning them here. I conclude that the defendants must bear the costs properly chargeable here.

Present order on notice.