Edith K. BELL et al., Petitioners
Below-Appellants/Cross-Appellees,

v.

KIRBY LUMBER CORPORATION,
Respondent Below-Appellee/Cross-
Appellant.

Supreme Court of Delaware.

Submitted Jan. 9, 1980.

Decided Feb. 20, 1980.

138

James F. Burnett, Wilmington (argued) of Potter, Anderson & Corroon, Wilmington, for petitioners below-appellants/cross-appellees.

William O. LaMotte, III and A. Gilchrist Sparks, Wilmington (argued), S. Samuel Arsht and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, for respondent below-appellee/cross-appellant.

Before McNEILLY, QUILLEN and HORSEY, JJ.

McNEILLY, Justice:

This is an appeal and cross-appeal from the Vice-Chancellor's denial of exceptions taken by certain minority stockholders (stockholders) and by the surviving corporation, Kirby Lumber Company (Kirby) to the appraiser's final report following a short form merger (8 *Del.C.* § 253). Alfred Folweiler, another stockholder, appeals from the rejection by the Vice-Chancellor of his timely letter addressed to Kirby which the Vice-Chancellor ruled was inadequate to constitute a demand for appraisal.

The factual and historical background leading to the merger and cash out of Kirby's minority stockholders by Santa Fe Industries, Inc. (Santa Fe) are detailed throughout the Vice-Chancellor's opinion. 395 A.2d 730 (1978). Reference is made to the Vice-Chancellor's opinion here to avoid unnecessary repetition.

I

During the fall of 1973 Santa Fe, then owner of approximately 95% of the outstanding stock of Kirby, in contemplation of acquiring the remaining stock of Kirby, commissioned W. D. Davis of the firm of Appraisal Associates to make an appraisal of Kirby's business and assets, and retained the investment banking firm of Morgan Stanley & Company, Incorporated (Morgan Stanley) to furnish an opinion of the fair market value of the Kirby minority stock, approximately 25,000 shares of a total outstanding of 500,000. The Davis appraisal of assets as of December 31, 1973, was $320,000,000, and the Morgan Stanley opinion of the per share fair market value of the Kirby minority stock was $125.[1] Based upon these reports and related data Santa Fe determined that a cash out of the Kirby minority was feasible and proceeded to effect the 8 *Del.C.* § 253 short form merger as of July 31, 1974. The owners of approximately 5000 Kirby shares dissented and properly demanded an appraisal under 8 *Del.C.* § 262. The appointed appraiser con-

1. A second appraisal of assets was authorized and performed by Richard L. Nichols of American Appraisal Associates. The Nichols' asset appraisal was as of July 31, 1974, the date of merger, and totalled assets in the amount of $227,754,000.

cluded the per share value of the Kirby minority stock to be $254.40, based upon an earnings value of $120, assets value of $456 with assigned weight of 60% to earnings and 40% to assets. Basically the greatest area of disagreement between the parties lies in the appraisers' valuation of assets and the weight assigned to assets and earnings in arriving at the fair value per share of Kirby minority stock on the date of merger. The entire fairness and strict judicial scrutiny rule of *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107 (1952); *Singer v. Magnavox Company*, Del.Supr., 380 A.2d 969 (1977); and *Tanzer v. International General Industries, Inc.*, Del.Supr., 379 A.2d 1121 (1977), as it applies to the merger itself is not before the Court in this appeal. The fiduciary duty aspect of this merger has been litigated in the federal courts,[2] but there is no issue here involving a violation of any fiduciary duty owed the minority by the majority in effecting the merger. Therefore, the assessment of damages does not include consideration by the Vice-Chancellor of possible rescission, monetary damages based upon factors beyond the scope of statutory appraisal, or other relief deemed appropriate in the discretion of the Court under *Singer*. Of primary consideration here is our inquiry into fair price within the context of entire fairness under the appraisal statute in assessing damages to be paid the minority as a result of their being cashed out. The stockholders contend that the entire fairness, close judicial scrutiny rule in this parent/subsidiary merger requires the Court to assess damages on the basis of a per share value of the stock as negotiated in a hypothetical third party arms length transaction in which the vast natural resource assets of Kirby would control. Kirby on the other hand would have earnings control on the traditional appraisal going concern basis, contending that the value of the shares depends upon the success of Kirby's manufacturing and marketing of lumber, plywood and other wood products for which the timber acreage provides a sustained yield.

## II

The stockholders' first argument is that because Santa Fe controlled the decision to cash out the minority stockholders of Kirby, the Vice-Chancellor erred by permitting appraisal under the short form merger statute to be used by the parent company as an instrument to avoid its fiduciary duty of entire fairness to the stockholders under *Sterling v. Mayflower Corp.*, supra; *Singer v. Magnavox Company*, supra; and *Tanzer v. International General Industries, Inc.*, supra. Kirby does not contest the applicability of the fiduciary duty of entire fairness by the parent to the minority, but does contend that to follow a standard of damages based upon an amount *all* shareholders would have received in a third party sale negotiated at arms length, is an unwarranted expansion of the appraisal remedy. Kirby claims this calls for an aliquot valuation of shares based upon a sale or liquidation rather than upon a determination of stock value in a going concern which is the traditional standard established by *Tri-Continental Corp. v. Battye*, Del.Supr., 74 A.2d 71 (1950) and its progeny.

Santa Fe, as the holder of 95% of Kirby's outstanding stock, had the power to do with Kirby whatever it chose. Based upon the Davis appraisal of assets it could have liquidated Kirby and realized approximately $670 per share for each stockholder. It could have negotiated a merger with an unrelated corporation; or it could have permitted the minority to continue in the corporation for better or for worse. Instead Santa Fe chose to cash out the minority because the price of the minority stock was as low as Santa Fe management could anticipate under existing market conditions. The stockholders claim this to be a forced sale at a distress price, at a time immediately following a period of rapid increase in the value of Kirby's assets, and prior to the time of a period of contemplated "phenomenal" growth. This argument is appealing from the stockholder's viewpoint because the majority engineered the transaction at

2. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

a time when it appeared to Santa Fe management that it was unlikely that the price of the Kirby minority shares would ever be less than it was at that time. The stockholders were effectively locked in. Aside from a tender offer for $65 per share and isolated transactions in the area of $85–95 the Kirby stock had no market but paid $3 per share dividends. In such a situation there is substantial likelihood that the takeout transaction may result in a low value appraisal. See Jonathan H. Holman, *1978 Ann. Survey of American Law*, 279, 296 (1978); Brudney & Chirelstein, *Fair Shares In Corporate Mergers and Takeovers*, 88 Harv.L.Rev. 297, 304 (1974).

The stockholders argue also that the application of the arms length standard urged by them would not result in a wholesale change in the mechanics of arriving at value by appraisal but could be accomplished by a reevaluation of weighting the traditional value factors, assigning controlling weight to asset value and negligible weight to earnings. The stockholders suggest in this case 90% to assets and 10% to earnings, something only slightly less than full liquidation. Kirby would weigh earnings over assets.

In *Tri-Continental Corp. v. Battye*, supra, this Court said:

"Section 61 of the General Corporation Law Code 1935, § 2093, provides that upon the merger of a corporation, stockholders who object to the merger and who fulfill the statutory requirements to register their objection shall be paid the value of their stock on the date of the merger, exclusive of any element of value arising from the expectation or accomplishment of the merger."

\* \* \* \* \* \*

"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.

The rule as stated requires that certain obvious conclusions be drawn. Thus, since intrinsic or true value is to be ascertained, the problem will not be settled by the acceptance as the sole measure of only one element entering into value without considering other elements. For example, as was specifically held in *Chicago Corporation v. Munds*, [20 Del.Ch. 142, 172 A. 452] supra, market value may not be taken as the sole measure of the value of the stock. So, also, since value is to be fixed on a going-concern basis, the liquidating value of the stock may not be accepted as the sole measure."

\* \* \* \* \* \*

"A great deal of argument in this cause has turned around the phrase 'net asset value' which is simply a mathematical figure representing the total value of the assets of General less the prior claims. The net asset value of the common stock of General could be determined as of any date by computing the total market value of the securities in the portfolio, adding to that sum the cash in the company's possession, deducting the total of the outstanding liabilities, debentures and preferred stock, and dividing the final result by the number of common shares outstanding.

However, since the value of dissenting stock is to be fixed on a going-concern basis, the taking of the net asset value as the appraisal value of the stock obviously

is precluded by the rule. This is so because, primarily, net asset value is a theoretical liquidating value to which the share would be entitled upon the company going out of business. Its very nature indicates that it is not the value of stock in going concern."

74 A.2d at 72–74.

In *Application of Delaware Racing Association*, Del.Supr., 213 A.2d 203, 207–208 (1965) this Court said:

"In substance, the rule as to scope of review is as it has always been, that it is our duty to review the evidence to test the propriety of the findings below. When the evidence consists primarily of depositions, documents, or the report of a master or appraiser, we may make our own conclusions, if the requirement of doing justice requires it and if the findings below are clearly wrong. Furthermore, when we are concerned with findings arising from deductions, processes of reasoning, or logical inferences, it is our duty to review them and, if the requirement of doing justice requires it and if the findings below are clearly wrong, then to draw our own inferences and reach our own conclusions. This is not to say, however, that we may ignore the findings below. On the contrary, when they are supported by the record and are the product of an orderly and logical deductive process, we, in the exercise of judicial restraint, accept them, even though independently we might have reached opposite conclusions. This, we think, is the rule this Court has followed in the past, and it is the rule it will continue to follow for the future."

\*   \*   \*   \*   \*   \*

"The argument of the stockholders that the fact that they are being forced out of a going concern and being paid off in cash should lead to a measure of value which would give them that which they would have received in the event of dissolution, while perhaps superficially appealing, is more properly addressed to the General Assembly which enacted the law as we have found it."

Applying the rules laid down by these authorities, the Vice-Chancellor rejected the stockholders' arms length standard because it "presupposes an acquisition value based upon the very fact that the company will not continue in business on the same basis that existed immediately prior to the merger. It introduces another element, namely the *value* another would place upon it as a price for merger as opposed to the corporation's independent value as a going concern."

We find nothing in the record to persuade us that the Vice-Chancellor erroneously exercised his judgment in rejecting the stockholders' arms length standard in favor of the traditional going concern standard under established Delaware law.

### III

The stockholders' second argument is that natural resource companies like Kirby cannot be, and are not valued properly by following traditional standards. They contend that natural resource companies must be appraised on the basis of the value inherent in the corporation's assets. On the other hand, Kirby argues that the Vice-Chancellor erred in accepting the weight assigned to assets by the Appraiser. Kirby contends that this Court should substitute a weighting scheme which gives controlling weight to earnings adjusted for the lack of a market for Kirby stock.

The Court of Chancery has weighted assets value from zero in *Gibbons v. Schenley Industries, Inc.*, Del.Ch., 339 A.2d 460 (1975), to 100%; *In re Creole Petroleum Corp.*, Del.Ch., C.A.No. 4860 (Jan. 11, 1978). In *Swanton v. State Guaranty Corp.*, Del. Ch., 215 A.2d 242 (1965) the Chancellor weighted assets at 60%, in *Levin v. Midland-Ross Corp.*, 194 A.2d 50 (1963) and *In re General Realty & Utilities Corp.*, Del.Ch., 52 A.2d 6 (1947) at 50%, 40% in *Sporborg v. City Specialty Stores*, Del.Ch., 123 A.2d 121 (1956) and *Adams v. R. C. Williams & Co.*, Del.Ch., C.A.Nos. 978, 993, (Feb. 21, 1961), 25% in *In re Olivetti Underwood Corp.*, Del.Ch., 246 A.2d 800 (1968), and 20% in

*Felder v. Anderson, Clayton & Co.*, Del.Ch., 159 A.2d 278 (1960) and *Heller v. Munsingwear, Inc.*, Del.Ch., 98 A.2d 774 (1953).

■ This Court also affirmed 12½% in *Universal City Studios, Inc. v. Francis I. duPont & Co.*, Del.Supr., 334 A.2d 216 (1975). It is thus apparent that no rule of thumb is applicable to weighting; rather, the rule becomes one of entire fairness and sound reasoning in the application of traditional standard and settled Delaware law to the particular facts of each case.

■ Asset value represents a judgment as to the fair market value of the assets based upon the price that would be agreed upon by a willing seller and a willing buyer under no compulsion to sell or buy, but the weighting of those assets with other available factors is left to the Court. *Poole v. N. V. Deli Maatschappij*, Del.Supr., 243 A.2d 67 (1968). As a result, appraisals involving different corporate structures have resulted in different weighting of factors for varying reasons.

In *Sporborg v. City Specialty Stores*, supra, involving an appraisal of minority shares of Oppenheim Collins & Co., Inc., an old well established business, dealing primarily in ladies' apparel, the Chancellor said:

"Since the appraiser gave independent weight to 'market' and 'sales' values and since I have ruled that such should not have been done, it will serve little purpose to discuss the various weightings employed by the appraiser.

We have here only two elements of value which in my opinion are entitled to independent weight—asset value ($42.35) and earnings value ($13).

Normally much greater weight is accorded the earnings value element for obvious reasons. However, I believe the asset value element must be given somewhat greater weight here because, for some time, Opcol was using more than an average amount of its assets to expand and improve its business activities and much of this was not yet reflected in earnings. Also the degree of the disparity between conceded asset value and earnings value is some further tentative proof that the earnings figure is low. My conclusion is supported in part by a comparison with similar businesses.

I therefore conclude that because of the special circumstances here present the asset value should be weighted at 40% and earnings at 60%. This results in a per share appraisal value of $24.74." 123 A.2d at 127.

In *Sterling v. Mayflower Hotel Corp.*, supra, this Court said:

"As we have already held, net asset value is one of the factors to be considered in determining the fairness of a plan of merger. But the requirement that consideration be given to all relevant factors entering into the determination of value does not mean that any one factor is in every case important or that it must be given a definite weight in the evaluation. The relative importance of several tests of value depends on the circumstances. Thus, in some cases net asset value may be quite important. But in the case at bar it is of much less importance than the factors analysed in the . . . [investment banker's] report. We are dealing here with corporations engaged in the hotel business, whose capital is invested largely in fixed assets. The shares of such corporations are worth, from the viewpoint of an investor, what they can earn and pay. A comparison of net asset values may have some weight, but it is of much less importance than demonstrated capacity of the corporation to earn money and pay dividends. In *Allied Chemical & Dye Corp. v. Steel and Tube Co. of America*, 14 Del.Ch. 64, 122 A. 142, Chancellor Wolcott, dealing with the relative importance of replacement costs and earning power as standards of value in connection with industrial property, expressed the view that earning power is by far the more important." 93 A.2d at 115–116 (citations omitted).

The Vice-Chancellor said in *Gibbons v. Schenley Industries, Inc.*, supra, with its

principal business being the distilling, importing and sale of spiritous beverages:

"[T]he investing and trading public, in reaching a judgment as to the value of corporate shares, gives consideration to corporate assets only insofar as they disclose a capability of generating earnings, a judgment exercised here, and I am satisfied that there is no possible means of arriving at an approximation of the value of Schenley's assets as generators of earnings as of the time here in issue when Schenley had an overvalued inventory, containing a number of unpopular brands, and most of its twenty-nine distilleries and related plants were closed down. Accordingly, an appraisal of its assets as of such time would not, in my opinion, have served as a basis for reliance by a would-be investor in Schenley stock as of the time immediately prior to the merger here in issue, and will be given no weight here."

"As stated in Graham, Dodd, Cottle & Tatham, Securities Analysis at p. 217:

'There is good reason for not taking the asset-value factor seriously. The average market price of a common stock over the years depends chiefly on the earnings power and the dividend payments. These, in turn, usually do not bear any close or reasonably consistent relation to the asset value. (While such relation may possibly be traced for corporations as a whole, the range in the case of individual companies is virtually unlimited). Investors and speculators have found that the asset value is typically no guide at all to earning-power value or average market price. Hence they have gradually come to give the asset-value factor practically no weight.' " 339 A.2d at 473.

■ The stockholders contend that historically Kirby has been engaged in the production of low margin wood products but recently has made significant changes in its production and marketing strategies which will not be reflected in earnings until the new Bon Weir plywood plant and new particle-board plant are in operation. They contend that since the traditional approach eschews the use of projected earnings value in appraising assets, it thus becomes appropriate to give greater than usual weight to asset value. The stockholders also contend that as in the cases of *In re General Realty & Utilities Corp.*, supra, and *Swanton v. State Guaranty Corp.*, supra, the thing making Kirby unique is its vast timberland, not its management or its manufacturing facilities. They rely upon the growth rate of the Kirby forest, rapid appreciation in value and saleability. In *Swanton* the Chancellor said:

"Where a company follows an investment policy which looks to appreciation of capital rather than generation of ordinary income, should the value resulting from such policy be specially considered in arriving at appraised value, and if so, where? The capital appreciation investment policy of Guaranty, presumably motivated in part by tax considerations, suggests that placing undue weight in this appraisal proceeding on the normally important earnings factor would give a false picture of the intrinsic value of Guaranty's stock. The same would be true if dividends were emphasized. Also, to the extent the 'market' apparently valued this stock on the basis of earnings and dividends, it clearly did not give full recognition to its going concern value. This may be in part because the full facts concerning value were apparently not a matter of public knowledge generally.

I therefore conclude that where, as here, the record solidly supports a prediction of further appreciation, it is entitled to significant consideration. Thus, such appreciation potential must be considered either under the earnings or the asset classification."

\* \* \* \* \* \*

"To repeat, this is not the ordinary business corporation whose value must arise in large measure from its ordinary earnings potential. Here the capital appreciation policy has succeeded. One cannot say that a stockholder is to be de-

prived of the benefit of that policy because of a merger. But if the stockholder is to obtain any meaningful benefit from this successful corporate policy up to this point, asset value must be weighted heavily. This is done not on the basis of a liquidation approach but because it is in this element at this time in the corporation's life that a very substantial portion of the intrinsic value of the shares is to be found." 215 A.2d at 245–246.

We agree with the logic of the Chancellor in *Swanton* and find it helpful in reaching our conclusion on the issue of weighting in this case, recognizing, however, that corporate policy in *Swanton* was to acquire land for the purpose of realizing on appreciation in value, whereas Kirby's resources are essential to the manufacturing operations on a sustained basis from which earnings are generated and dividends paid.

Kirby on the other hand contends that to approach weighting of assets from the stockholders' viewpoint would be to assign heavy weight to a theoretical liquidating value proscribed by settled Delaware law, which Kirby stockholders had no foreseeable possibility of receiving. The stockholders respond to this contention by saying they are not seeking a liquidation value but that they are seeking to be treated on a par with Santa Fe.

The stockholders attack the weight assigned to earnings value which was computed by applying a multiplier of 15.2 to Kirby's average earnings of $7.92 for the five year period prior to the merger. The stockholders' attack is not directed to the earnings' multiplier, but to the use of historical earnings which they claim are unrealistic in view of the future earnings' projection and should be disregarded or recalculated. *Swanton v. State Guaranty Corp.*, supra.

Kirby contends the earnings' value determined by the Appraiser and accepted by the Vice-Chancellor is an accurate reflection of the fair value of Kirby stock *if* it is discounted for lack of a market.

The Appraiser in arriving at his conclusions as to the weight he assigned to assets and earnings stated:

"A factor which casts a shadow on this appraisal is the fact that the disparity between market value of assets and earnings value (or for that matter reconstructed market) was not at the time unique to Kirby. Indeed such a disparity existed at the same time in many natural resource companies including Morgan Stanley's comparables. I deduce from this that at the time of the merger, the market prices were depressed and therefore the price earnings multiple derived from comparables used in determining earnings value was lower than one might hope for on the average. *Sporborg v. City Specialty Stores*, 123 A.2d at 127. Compare *Chicago Corporation v. Munds*, Del.Ch., 172 A. 452, 454 (1934). It is at such times some say, that companies have a tendency to buy out their minorities and thus turn the disparity of value between assets and capitalized earnings into a bargain for the parent. Townsend testified accurately, I believe, that minority stockholders could, at such a time, take their lesser price, reduced by market forces and buy into other equally depressed situations. That seems fair enough, but there are unknown tax and transaction costs to be considered and there is also the recognition that the corporation may have obtained a bargain at the expense of its stockholders; although, I suppose on the same logic as above, other bargains besides the Kirby minority's stock would have been available to the parent on the market place. Fortunately, I need not go extensively into this area because the present weighting of assets takes care of whatever disparity may exist.

Therefore, considering the peculiar nature of natural resource companies, the inferences of saleability of the assets and the disparity between asset and earnings value, I conclude that this case is more like *Levin* or *Sporborg*, than it is like *Schenley*. I, therefore, weight assets at 40% and capitalized earnings at 60%."

The Vice-Chancellor accepted the Appraiser's 40/60% assignment of weight, and

we are not persuaded from our review of the record and arguments of counsel to rule otherwise. Kirby's assets at the time of the merger were appreciating in value, appeared to be saleable on the open market although no sale or liquidation was contemplated, and the forest utilization on a sustained-yield basis was readily available to generate an anticipated increase in earnings. Therefore, as in *Swanton*, asset value is entitled to substantial weight. However, earnings value and reconstructed market value also must be accorded substantial weight under the methodology approved by this Court in *Universal City Studios, Inc. v. Francis I. duPont & Co.*, supra. The earnings value gives effect to Kirby's future prospects to the value of its assets, and to what Kirby stockholders should derive as the value of their stock on the date of merger. We feel as the Vice-Chancellor that the 40% weight assigned to asset value, which represents $182.40, or 71%, of the total value of $254.40 per share assigned to the Kirby stock, and the 60% weight assigned to earnings value, "fairly capture the situation", as will appear from our response to the substantive and evidentiary attacks on the appraisals and rulings of the Appraiser in his acceptance and rejection of evidence offered at the hearing before the Appraiser.

## IV

In considering the parties' respective positions on the Morgan Stanley evaluation of earnings value we find the testimony of Charles C. Townsend (Townsend) most helpful. Townsend as managing director of Morgan Stanley was the person responsible for the opinion rendered Santa Fe as to the value of Kirby stock for purposes of the contemplated merger. Preliminarily Townsend and his staff inspected the Kirby forests and manufacturing facilities, and made a comparative analysis of other companies in the industry including a review of factors such as revenues, income from sales, return on equity, timber acreage, earnings per share, market price, price earnings ratios, and dividend yield. Based upon these observations Morgan Stanley concluded that

Kirby was among the higher quality companies in the field, and that it deserved a higher than average price/earnings ratio which they figured should be about ten times earnings. Townsend also testified that the $125 reconstructed market value was the value Morgan Stanley thought a share would trade at in the market whether it was a single share owned by Santa Fe or a single share owned by the stockholders.

Early in their work Townsend and his team met with a group from Santa Fe to review a timber volume analysis, from which they concluded that Kirby was managing its forests in a manner to support its business and there was no excess timber. For that reason it was decided that Kirby needed its timber assets to support its ability to earn and pay dividends. They also thought it either proper or appropriate to add any increment of value for timber that either was not necessary or Kirby could not use in another manner. On this point Townsend testified that the $125 per share opinion would not have been changed materially by accepting either the $320,000,000 dollar Davis appraisal of assets or the $230,000,000 Nichols appraisal because both were so large, as compared to their conclusion of what market value (reconstructed) would be, that either would have caused them to bias their conclusion on price-earnings ratio substantially upwards.

In opining that the reconstructed market value on the date of merger would have been $125 per share, Morgan Stanley assumed that the Kirby shares were widely distributed and freely traded such that willing buyers and sellers could readily effect transactions. Townsend explained this assumption, knowing that such was not the fact, because stock which is broadly distributed and freely traded is more valuable, requiring here a built-in discount rate to bring the stock into the category of being marketably attractive.

In considering Kirby's dividend policy in connection with earnings value, Townsend testified that a comparison with other companies was made for the period 1969

through 1973. Kirby's earnings payout or dividend payout for that period was 38.1 percent. Among the other companies, six paid out less, three the same, and three more. Based upon this comparison it was concluded that Kirby's dividend payout was not unreasonable.

Townsend testified that Kirby's capital expansion program and its five year projection of increased earnings entered into their utilization of comparables and the price/earnings ratios of comparable companies because a number of other forest companies were in a very expansionary mode of planning new facilities. Townsend further testified that expansion and increased earnings was a very positive factor in the minds of his appraisal team. He indicated that they looked at historical earnings as compared to other companies in the business and determined that there were no extraordinary factors related to historical earnings which were not apparent in the industry as a whole.

■ In calculating earnings value, average payout ratios of comparables were considered, as were historical and projected earnings, Kirby's partially completed capital program, Kirby's appraised asset value, and Kirby's aggressive management. A ratio of 15.2 was selected, which when multiplied by five years average earnings of $7.92 per share, resulted in an earnings value of $120 per share.

On the basis of our review of the Townsend testimony we are satisfied that the Morgan Stanley appraisal is the product of an orderly and logical deductive process in accordance with approved methodology properly accepted by the Appraiser and the Vice-Chancellor. *Application of Delaware Racing Association*, supra; *Universal City Studios, Inc. v. Francis I. duPont & Co.*, supra; *Sporborg v. City Specialty Stores*, supra.

■ Kirby would have the earnings value determined by the Appraiser and the Vice-

Chancellor, adjusted for lack of a market. The Appraiser stated that he was aware of no Delaware authority for discounting earnings and declined to do so. We agree.

V

■ The stockholders claim the Appraiser and the Court of Chancery erred in rejecting the Davis valuation of assets and in accepting the Nichols valuation of assets, in rejecting the testimony of Charles H. Carpenter, and also in rejecting their estoppel argument.[3]

Both Davis and Nichols based upon their years of experience and their professional credentials were well qualified to appraise the assets of Kirby. Their appraisals compare as follows:

| | Davis | Nichols |
|---|---|---|
| Land | 103,898,515.50 | 66,424,000.00 |
| Stumpage (growing timber) | 207,268,000.00 | 125,000,000.00 |
| Construction in Progress | 8,695,380.52 | 21,657,000.00 |
| Improvements | 20,000,000.00 | 14,673,000.00 |
| Total | 339,861,986.02 | 227,754,000.00 |
| Less 4% Discount for Size | 320,000,000.00 | N/A |

At the outset of his report Davis stated that the purpose of the appraisal was to estimate the market value of the land, exclusive of minerals, buildings, equipment belonging to Kirby based upon "the price which the property would bring when it is offered for sale by one who desires but is not obligated to sell and is bought by one who is under no necessity of buying it. (*State v. Carpenter et al.*, 126 Texas 604, 89 S.W.2d 194)." This basis purports to be on the "willing seller/willing buyer" as required by *Poole v. N. V. Deli Maatschappij*, supra. Our review of the record, however, leads us to the same conclusion as the Appraiser and the Vice-Chancellor that the report is a going concern appraisal based largely on two sales transactions, the Temple Time merger and the Crown Zel-

3. The Davis $320,000,000 valuation of assets is the equivalent of $640 per share, whereas the Nichols' $227,754,000 valuation accepted by the Appraiser and after certain adjustments made by the Appraiser, amounts to $456 per share.

lerbach/Lehman purchase of Tremont, without making any adjustment from going concern value to liquidation of assets i. e., the willing seller/buyer standard of *Poole*. The Davis appraisal is very thorough and detailed, covering 300 pages of text. But our review of the record leads us to agree with the Appraiser and the Vice-Chancellor in their reliance upon the Nichols' report which we find to be in conformity with the methodology approved in *Poole v. N. V. Deli Maatschappij*, supra.

In arriving at his final asset value Davis followed three approaches: (1) the cost approach which he described on deposition as a piece by piece sale; (2) the earnings approach in which he capitalized earnings at 2%; and (3) the direct sales approach which he described as an entire package sale and the best approach. In computing asset value under the direct sales approach Davis analogized, adjusted and compared his analysis of the Temple and Tremont transaction with Kirby appraisal figures because "they were the only two sales of any size in the vicinity and were therefore the best guide as to the whole of the Kirby property in my judgment." From our review of the Davis report and the Davis deposition it appears that in his allocation of values in the Temple and Tremont transactions Davis based his allocations upon what he thought the buyers intended and not upon allocation of amounts taken from the actual transactions. Because of his discussions with Mr. Temple of the Temple company, Davis did have more information about Temple than about Tremont, but it does not appear that his information included actual allocations of amounts. There are many questionable details in the Davis report in addition to the errors therein emphasized in the Vice-Chancellor's opinion which we find unnecessary to discuss because of our approval of the Nichols report.

## A

■ The stockholders contend the Appraiser and Vice-Chancellor erred in rejecting the testimony of Dr. Charles H. Carpenter. There is nothing in the Appraiser's report, nor in the stockholders' appendix containing excerpts of the Carpenter testimony, to verify that the Appraiser rejected the Carpenter testimony. To the contrary Dr. Carpenter qualified as an expert consultant and technical advisor to the pulp and paper industry, to timberland owners and lumber companies in matters involving pulp and paper companies. Dr. Carpenter also was familiar with the Tremont transaction since he was involved as a consultant with one of the forty-four companies interested in buying Tremont. Dr. Carpenter testified at great length before the Appraiser who merely stated in his report:

"I will not deal at any length with Dr. Charles H. Carpenter's testimony. Being a stockholder, he had a direct interest in the outcome. On the major area on which the petitioners rely in the briefs on Carpenter (the emphasis placed by buyers of natural resource companies on assets), there is other testimony in the record."

Dr. Carpenter was one of the Kirby stockholders who sought an appraisal, a valid reason for the Appraiser to consider in weighing the evidence before him. We find nothing in the record on this issue to support a finding of an abuse of discretion on the part of the Appraiser.

## B

■ The stockholders claim that Kirby should be estopped from impeaching the Davis report because it was attached to the merger information statement sent to the stockholders in which it was stated:

"This Information Statement . . . includes . . . the results of certain appraisals made respecting Kirby. Each of the minority stockholders of Kirby is urged to read this material carefully in making his or her determination to seek or not seek an appraisal . . . ."

Had Kirby not attached the Davis report to the information statement it would have been a breach of complete candor under this Court's decision in *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1977). To estop the Court of Chancery, or the Appraiser appointed by the Court, from con-

sidering whatever appropriate evidence there may be in the record to the exclusion of evidence deemed inappropriate, absent an abuse of discretion, is inconsistent with sound reason or precedent. See *In re General Realty & Utilities Corp.*, supra; *In re Olivetti Underwood Company*, supra.

## VI

■ Acting pursuant to 8 *Del.C.* § 262(h), the Vice-Chancellor awarded interest on the fair value of Kirby stock at the rate of 7% per annum from the date of merger to the date of payment. Kirby does not quarrel with the rate of interest accruing between the date of merger and the date of judgment, but contends the post judgment rate should have been no more than the legal rate of 6%.

Kirby's contention is without merit. The purpose of interest is to fairly compensate the stockholders for their inability to use the money during the entire period in question. The amount of interest awarded pursuant to 8 *Del.C.* § 262(h) is discretionary. We cannot independently find an abuse of discretion in the Vice-Chancellor's award of 7% simple interest from the date of merger to date of payment. *Universal City Studios, Inc. v. Francis I. duPont & Co.*, supra; *Felder v. Anderson, Clayton & Co.*, Del.Ch., 159 A.2d 278 (1960).

## VII

The stockholders contend the Vice-Chancellor erred in holding the letter of Alfred Folweiler insufficient to constitute a demand for appraisal under 8 *Del.C.* § 262(b). They also dispute Kirby's contention that the appeal of Folweiler had to be filed within 30 days of the entry of the order dismissing his claim, rather than within 30 days of the entry of the final order of the Court below.

■ In the absence of an express determination that there is no reason to delay and an express entry of judgment against a party, Chancery Court Rule 54(b) provides that any order adjudicating fewer than all the claims of all the parties in an action is subject to revision at any time prior to the entry of judgment adjudicating all such claims. That express determination and express entry of judgment do not appear in the record. Consequently, the order dismissing Folweiler's claim was not final at the time it was issued, and his appeal is timely. See *Lightburn v. Delaware Power & Light Co.*, Del.Supr., 158 A.2d 919, 922 (1960).

■ The Vice-Chancellor improperly rejected the Folweiler letter to Kirby as a demand for an appraisal under under 8 *Del.C.* § 262(b). Folweiler's letter referred to Kirby's offer of $150.00 per share and further stated:

"Inasmuch as I regard the offered price as inadequate, based on the data that accompanied the offer, I am not submitting my stock certificate for 25 shares.

"It is my opinion that the stock has a value of $601/share. Upon request, data will be presented to support my opinion concerning the value of the stock."

In *Raab v. Villager Industries, Inc.*, Del. Supr., 355 A.2d 888, 891 (1976) this Court said:

"The requirements of § 262(b) are to be liberally construed for the protection of objecting stockholders, within the boundaries of orderly corporate procedures and the purpose of the requirement."

Realistically, the explicit rejection of the $150.00 offer was a demand for the only available alternative, appraisal under § 262. The language reasonably informed Kirby that Folweiler wanted an appraisal. The letter can, "by fair implication, be read as being [a] written demand[s] for payment." *Carl Marks & Co. v. Universal City Studios, Inc.*, Del.Supr., 233 A.2d 63, 64 (1967); and the Vice-Chancellor erred in determining otherwise. We hold that Mr. Folweiler's letter met the requirements of 8 *Del.C.* § 262(b) and that he should have been allowed to remain as a plaintiff in this action.

AFFIRMED, in part; REVERSED, in part.

QUILLEN, Justice, concurring:

While I concur in the decision in this case, there are certain points which seem analytically important to me and which by their nature are not emphasized philosophically in the Court's opinion disposing of the appeal on the merits. With the encouraging tolerance of my colleagues, I therefore take the liberty to note my own impressions on these points in capsule form by way of this concurring opinion.

First, this appraisal case is on appeal and subject to standards of appellate review. The question of whether reversible error exists in a given case is not the same as a question of whether the best possible result has been reached at trial. A review takes place in the context of a specific, and necessarily limiting, evidentiary record, including rulings to which deference must be paid in areas of fact and discretion. But it can be a mistake to read past appellate decisions on evaluation as a bar to future creativity and fresh approaches.

Second, there can be no question that, within a statutory appraisal context, the "entire fairness" and "careful scrutiny" doctrines are applicable. *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107, 110 (1952). While the *Sterling* case was not a statutory appraisal proceeding, it was a valuation case in a stock-for-stock merger and indeed the Court referred to appraisal proceeding precedent in reaching its conclusion. *Id.*, 93 A.2d at 114. The issue in *Sterling* was stated in terms of "substantial equivalent in value". *Id.*, 93 A.2d at 110. Thus, the "entire fairness" concept arose in an evaluation context and is particularly applicable to statutory appraisal proceedings. Indeed, perhaps the most effective way for a court "not [to] be indifferent to the purpose of a merger when a freeze-out of minority stockholders on a cash-out basis is alleged to be its sole purpose"[1] is to consider such factor as motive evidence on the issue of fair value.

Third, the "proportionate interest in a going concern" or "the intrinsic value of . . . share[s] in a going concern" standard[2] does not seem to me to be a standard of any substantial evidentiary restriction. As the Court, speaking through then Judge Wolcott (later Chancellor, Justice and Chief Justice), said in *Tri-Continental Corporation v. Battye*, Del.Supr., 74 A.2d 71, 72 (1950):

"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value."

While it is true that our Courts have under this standard in given cases rejected market value as the sole measure of the value of stock [*Chicago Corporation v. Munds*, Del. Ch., 172 A. 452 (1934)] and rejected liquidating value of the stock as the sole measure [*Tri-Continental Corporation v. Battye, supra*], it is equally true that there is no requirement that the trier of fact give some weight to every factor in every case. See *Francis I. duPont & Co. v. Universal City Studios, Inc.*, Del.Ch., 312 A.2d 344 (1973), aff'd, Del.Supr., 334 A.2d 216 (1975) (reject-

---

1. See *Singer v. Magnavox Co.*, Del.Supr., 380 A.2d 969, 979 (1977).

2. *Tri-Continental Corporation v. Battye*, Del. Supr., 74 A.2d 71, at 72 and 76 (1950); former 8 *Del.C.* § 262(b) and (f). See also present 8 *Del.C.* § 262(f).

ing market value); *David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427 (1968) (rejecting, in an injunction context, historic earnings). It should be thus noted that, since there is no requirement that each factor be weighted in every case, an expert has wide flexibility in valuation approach if he can state why a given factor should be rejected. In the case now on appeal, the Appraiser, by rejecting market value and by assigning weight to earnings value (60%) and asset value (40%), had the opportunity to exercise a factual judgment of wide flexibility. Obviously, if asset value had been given even greater weight, the ultimate valuation would have been closer to a liquidating valuation akin to that sought by the dissenting stockholders in this case. Thus, it is important to bear in mind that the traditional standard is open to a broad range of evidentiary possibilities subject only to normal evidentiary standards of relevancy. In my judgment, counsel and the courts, through the flexibility implicit in the traditional standard, should encourage the legislatively established valuation process to be open to generally accepted techniques of evaluation used in other areas of business and law.

Fourth, we would be remiss in this area of the law if we failed to note the major effort that has been made by the General Assembly and by this Court to promote the adequacy of the statutory appraisal remedy. See 60 *Del.Laws*, Ch. 371 (1976) and *Raab v. Villager Industries, Inc.*, Del.Supr., 355 A.2d 888 (1976), cert. den., 429 U.S. 853, 97 S.Ct. 147, 50 L.Ed.2d 129 (1976). Again, in the Court's opinion in this case, the Court rejects the philosophy that shareholders seeking an appraisal can be successfully thwarted by technical resistance inconsistent with the duties of the corporate structure. It is particularly worthy of note that the present law, unlike the law existing at the time this case arose, calls for appraisal proceedings to be tried before the Chancellor or a Vice Chancellor. 8 *Del.C.* § 262(f). With due respect to the magnificent job that court-appointed appraisers have performed over the years, and with particular respect to the outstanding performance by the Appraiser in this case, the statutory change should generally foster improvement in the proceeding by accelerating the process, by eliminating a level of review, and by assigning to chancery judges (with their judicial and equitable feel for flexibility and its relation to fairness) the trial function. It should be anticipated that, if, in the past, the process has been burdened by too strict an adherence to precedent from different factual contexts than a case at hand, relief has been supplied by a change of the initial forum.

I concur in the decision in the present case because I find: (1) the Appraiser's rejection of the Davis appraisal was legally proper and factually reasonable; (2) the Appraiser's conclusion in the mixed question of fact and law that no estoppel effect should be given as a result of the inclusion of the Davis appraisal in the Information Statement sent to stockholders was correct; (3) the Appraiser's factual decision to value assets at $456.00 on the basis of the Nichols report was reasonable; (4) the Appraiser's weighting of earning value and asset value, carefully reviewed by the Vice Chancellor, was within the permissible realm of reasonable judgment. I am somewhat hesitant about the earnings value figure, since in the exercise of independent trial judgment I may have concluded that the five-year averaging approach was inappropriate in this case. But I cannot say, given standards of review, that it constitutes reversible error, especially since the decision is based on a limiting record and expert opinion, including testimony as to the multiplier, which itself was tied to historic earnings. In addition, I have not been persuaded that a different earnings approach would substantially change the result.

In light of the foregoing, I concur with the decision of the Court affirming the decision below.